TALLMADGE BROTHERS, INC., ET AL. *v.* IROQUOIS GAS TRANSMISSION SYSTEM, L.P.
(SC 16201)

McDonald, C. J., and Borden, Norcott, Katz and Peters, Js.

Argued December 2, 1999—officially released March 15, 2000*

* March 15, 2000, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

*James R. Fogarty*, with whom was *Carolyn A. Collins*, for the appellant-appellee (defendant).

*Thomas M. Cassone*, with whom, on the brief, were *Lawrence M. Lapine, Robert S. Bello* and *Christopher T. Coburn*, for the appellees-appellants (plaintiffs).

*Opinion*

PETERS, J. The dispositive issue in this appeal is whether a general release and merger clause contained in contracts between commercial parties operates to preclude any future claims of contractual liability against the party for whose benefit the general release was executed. We conclude that, under the circumstances of this case, the unambiguous language of the parties' contracts precludes any such claims of liability. Accordingly, we reverse the judgment of the trial court.

The plaintiffs, Tallmadge Brothers, Inc. (Tallmadge Brothers), and Robert J. Sabo, filed a ten count complaint against the defendant, Iroquois Gas Transmission System, L.P. The complaint contained, inter alia, claims for detrimental reliance, breach of contract, unfair trade practices, trespass and fraudulent misrepresentation.

Subsequent to the filing of the plaintiffs' complaint, the parties agreed, pursuant to General Statutes § 52-425,[1] to submit their case to a committee of the Superior Court, which would hear evidence, find facts and offer its legal recommendations to the court. The committee, former Superior Court Judge Nicholas A. Cioffi, recommended a finding in favor of the plaintiffs on the breach of contract counts and damages awards in the amount of $282,345 for Tallmadge Brothers and $54,000 for Sabo. Thereafter, the trial court, *Lewis, J.*, modified the committee's findings and awards. The court rendered a judgment in favor of the plaintiffs in the amount of $3,203,852 for Tallmadge Brothers, and $355,388 for Sabo. The defendants appealed and the plaintiffs cross appealed from the judgment to the Appellate Court, and we transferred the case to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

The record reveals the following relevant facts. The plaintiffs operate shellfisheries in Long Island Sound, from which they harvest oysters and clams.[2] Tallmadge Brothers, holds perpetual franchises[3] to approximately 20,000 acres of shellfish grounds throughout Long Island Sound, and Sabo has a contractual interest in

[1] General Statutes § 52-425 (a) provides: "In any civil action pending in the Superior Court in which an issue of fact has been closed to the court, the court may, upon motion of any party to the record, appoint a committee of one, two or three disinterested persons to hear the evidence and report the facts to the court. A committee shall not be appointed without the consent of all parties appearing, unless the court, after a hearing upon the motion for appointment of a committee, is of the opinion that the questions involved are such as clearly ought to be sent to a committee."

[2] Other than their status as the plaintiffs in this case, Tallmadge Brothers and Sabo do not have any contractual or other relationship with each other.

[3] General Statutes § 26-192 provides that all shellfisheries located in the state of Connecticut are under the jurisdiction either of the state, or of the town in which the specific shellfishery is located. Pursuant to General Statutes §§ 26-194 and 26-237c, persons wishing to engage in the business of shellfishing may acquire the right to do so either by leasing the shellfish grounds for a renewable ten year period, or by acquiring a license to harvest shellfish.

163 acres of shellfish grounds. The defendant is the owner and operator of the Iroquois Natural Gas Transmission Pipeline (pipeline), which runs from the Canadian border, through New York and Connecticut, across Long Island Sound, to its terminus on Long Island.

In 1986, the defendant met with the plaintiffs and state and federal officials to discuss its proposal to build the pipeline across shellfish grounds operated by Tallmadge Brothers,[4] and the possible impact that pipeline construction might have on the plaintiffs' shellfisheries.[5] Negotiations among the parties did not resume in earnest until January, 1990, at which time Sabo expressed his desire that the pipeline be moved from his shellfish grounds to those of Tallmadge Brothers. In the latter part of 1990, employees of the defendant and the plaintiffs conducted samplings of the shellfish grounds that lay in the various possible paths of the pipeline in order to determine the shellfish density in those areas. In November, 1990, the coastal resources management division of the state department of environmental protection issued, pursuant to federal environmental regulations, a consistency certification letter, which stated that "the proposed [pipeline is] consistent with Connecticut's federally-approved coastal management program, subject to strict adherence to the following conditions as agreed to by [the defendant] and the [d]epartment of [e]nvironmental [p]rotection."[6]

---

[1] The shellfisheries at issue in this case were located in Milford Harbor.

[5] Sabo was not present at the initial meeting.

[6] The two most relevant conditions, for purposes of this appeal, read as follows:

"10. The [defendant] shall monitor the pre- and post- construction conditions of oyster beds within Long Island Sound. Any damage to the oyster beds shall be promptly restored to pre-construction conditions. The [defendant] shall mitigate impacts to shellfish beds by allowing leaseholders to harvest the beds prior to construction and by compensating for lost resources. After construction, shellfish beds shall be restored and cultch replaced to Department of Agriculture-Aquaculture Divison, National Marine Fisheries Service and leaseholder's satisfaction.

On December 6, 1990, the parties held a meeting attended by, among others, Sabo, Hillard Bloom, the president of Tallmadge Brothers, and Ross Milne, the defendant's representative during the course of the negotiations. At that meeting, Milne informed all present that the pipeline would be constructed in a 200 foot corridor across Long Island Sound, and that within that corridor "there would be a 100% devastation of shellfish . . . ." Although the parties anticipated that there would be incidental damage caused by the pipeline construction beyond that 200 foot area, they were unable to agree as to the likely extent of that incidental destruction. Subsequent to that meeting, the defendant sent to various contractors bid packages, for the construction of the pipeline. In those packages the defendant described the work area as being 300 feet wide, and the construction specifications called for the dragging of a heavy smoothing beam along a 300 foot wide corridor.[7] The plaintiffs were not informed about the discrepancy between the width of the work area described in the bid packages and that represented to them by the defendant in their negotiations.

On January 30, 1991, the parties held another meeting, at which the defendant offered Tallmadge Brothers $1,704,540 and Sabo $757,000 as compensation for the expected damage from the pipeline construction.[8] The

"11. If pipeline construction precludes any shellfish harvesting, the [defendant] will financially reimburse leaseholders for full market value of the resource impacted to satisfaction of shellfish bed leaseholders."

[7] The defendant also submitted, pursuant to department of public utility control regulations, a development and management (D&M) plan for the siting of the pipeline. As with the bid packages, the D&M plan showed a 300 foot wide work area.

[8] These amounts were based on calculations made by David Warman, an engineer employed by the defendant. Warman, who advised the defendant throughout the negotiations, arrived at these figures by calculating the total area of expected shellfish devastation, multiplying that area by the average expected shellfish yield, and multiplying that figure by the fair market value of the shellfish.

defendant subsequently increased these amounts slightly, to $1,730,768 for Tallmadge Brothers, and $769,231 for Sabo, and, in addition, promised to pay damages to be calculated after postconstruction testing of the shellfisheries. Alternatively, the defendant offered the plaintiffs double those amounts as a full and final settlement for all damage caused by, or incident to, construction.

Between February 5 and March 1, the parties exchanged a series of draft settlement contracts. During this period, Tallmadge Brothers was represented by Attorney Joseph Richichi and the defendant was represented by Attorney Anthony Fitzgerald. Sabo did not retain the services of counsel. In the usual manner of commercial negotiations, each party attempted to word the contracts in the manner most favorable to its respective interests.

On February 25, Sabo and the defendant executed the final settlement agreement that is at issue in this case.[9] Tallmadge Brothers and the defendant did the

---

[9] The contract between Sabo and the defendant stated in relevant part:
"FULL AND FINAL SETTLEMENT
AGREEMENT
"This Agreement is made as of the      day of February, 1991 by Robert J. Sabo of Easton, Connecticut d/b/a R.S. Milford Oyster Farm and Coastal Oyster Farms, Incorporated, a Connecticut corporation, both having an office at 219 Mile Common, Easton, Connecticut 06612 (hereinafter called collectively 'RJS') with Iroquois Gas Transmission System, L.P., a Delaware Limited partnership having its principal office at One Corporate Drive, Shelton, Connecticut (hereinafter called 'IGTS').
"Whereas, pursuant to a Certificate of Public Convenience and Necessity issued by the Federal Energy Regulatory Commission to IGTS on November 14, 1990, IGTS intends to construct and operate a natural gas transmission pipeline from the international border between the United States and Canada, through New York and Connecticut, across Long Island Sound, to Long Island, New York;
"Whereas, RJS has a leasehold interest in a perpetual franchise for the seeding, cultivation and harvesting of oysters with respect to a certain oyster ground off Milford, Connecticut containing approximately 163 acres known as 'Lot No. 655, M.M. Law' shown on Exhibit A attached hereto and made a part hereof (hereinafter called the 'Oyster Grounds');

"Whereas, IGTS proposes to construct a natural gas pipeline under portions of the Oyster Grounds and will during the period of construction temporarily disrupt the use of the Oyster Grounds by RJS;

"Whereas, the construction by IGTS of its natural gas pipeline under the Oyster Grounds will result in damages to the oyster resource of RJS on Lot No. 655;

"Whereas, RJS and IGTS, after independent investigation and study by each, now wish to provide for the temporary interruption of RJS's use of the Oyster Grounds and the liquidation of RJS's damages resulting from IGTS's activities in connection with its natural gas transmission pipeline;

"Now, therefore, in consideration of the mutual promises and covenants contained herein, the parties agree as follows:

"1. RJS hereby consents and agrees that for the period of the construction of the natural gas pipeline, which shall not exceed twelve (12) months in duration (the 'Construction Period'). RJS will not make any use of the temporary 'Work Area' to be used by Iroquois. Said Work Area is that portion of the Oyster Grounds within one hundred (100) feet on either side of the intended location of the pipeline, as shown on Schedule A hereto. RJS will not make any use of such Work Area during the Construction Period, including without limit, the seeding, cultivation or harvesting of oysters therein. During the Construction Period, IGTS and its agents, employees, contractors and subcontractors may construct and install a buried pipeline and all of the appurtenances or facilities useful or convenient in connection with or incidental thereto, for the transportation of gaseous or liquid hydrocarbons and any product or by-product thereof (such pipeline, appurtenances and facilities are hereinafter referred to as the 'Pipeline') under and across the oysters or the Oyster Ground in the approximate location shown on the sketch attached hereto as Exhibit A, including the creation of a trench in which the Pipeline will be buried, and the filling of the same after the completion of construction of the Pipeline.

"2. RJS shall retain the right to seed, cultivate or harvest oysters and oyster cultch in the portion of the Oyster Grounds outside the Work Area, during the Construction Period, so long as such activity does not in any way interfere with the pipeline construction.

"3. Simultaneously with the execution of this Agreement, IGTS has paid to RJS One Million Five Hundred and Thirty-Eight Thousand Four Hundred Sixty-Two ($1,538,462) Dollars by certified check, the receipt of which is hereby acknowledged, as liquidated damages for, and as full and final settlement of, all damages, claims etc. specified in paragraph 4 of this Agreement.

"4. RJS hereby releases and discharges IGTS and its successors, assigns, agents, employees, contractors, and subcontractors from all actions, causes of action, debts, sums of money, agreements, promises, trespasses, damages, judgments, executions, claims and demands whatsoever, in law, admiralty or equity, which RJS ever had, now has or hereafter can, shall or may have, upon or by any reason of any matter, cause or thing whatsoever, incident to the construction of the Pipeline, and any acts in connection therewith,

including, without limit, loss of or damage to oysters or other forms of shellfish that RJS may have claim to, now or hereafter, located on said Oyster Grounds known as Lot No. 655, loss of profits from RJS's shellfish operations, or damage to or decreased productivity from said Oyster Grounds.

"5. RJS represents and warrants to IGTS that (i) RJS is the owner of the oysters and oyster cultch on the Oyster Grounds known as Lot No. 655 and has a valid leasehold estate in said Oyster Grounds, as represented by a document filed with the State of Connecticut, Department of Agriculture, Aquaculture Division, Milford, Connecticut for recordation on or about June 20, 1987; (ii) the leasehold estate of RJS is the only leasehold of the perpetual franchise for the harvesting, planting and cultivation of oysters on said Oyster Grounds; (iii) RJS has good right and lawful authority to enter into this Agreement; and (iv) RJS will permit IGTS to use, possess, occupy and enjoy the Work Area during the duration of the construction, for the purposes specified in this Agreement without hinderance or molestation from RJS or from any person claiming by, for or under him.

"6. This Agreement contains the entire and only agreement between the parties and no oral statements or representations or prior written matter not contained in this instrument shall have any force and effect. This Agreement may only be changed, modified or discharged by an agreement in writing executed by the parties hereto.

"7. If any term, covenant, condition or provision of this Agreement or the application thereof to any person or circumstances shall, to any extent, be invalid or unenforceable, the remainder of this Agreement, or the application of such term or provision to the person or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby and each term, covenant and provision of this Agreement shall be valid and be enforceable to the fullest extent permitted by law.

"8. RJS will, at any time, at the request of IGTS promptly execute an instrument, in recordable form and in a form agreeable to RJS, which will constitute a short form notice of this Agreement setting forth a description of the Oyster Grounds, terms of this Agreement and such other provisions as IGTS or RJS may request. IGTS or RJS may at its option, record in such records as they, jointly or severally deem appropriate, such short form notice of this Agreement.

"9. All notices, requests, demands, approvals, consents and other communications authorized or appropriate hereunder shall be in writing and shall be given by mailing the same by certified mail or registered mail, return receipt requests, postage prepaid, to the respective party for whom intended, at the address first hereinabove set forth, or such other address as such party might designate by notice to the other party similarly given, and the same shall be deemed to have been received three business days after the same is deposited, postage prepaid, in the United States mail.

"10. This Agreement is made and executed in and is to be construed under the laws of the State of Connecticut.

same on March 1.[10] As compensation for a complete

"11. The agreements, conditions, covenants and terms herein contained shall, in every case, apply to, be binding, and inure to the benefit of the parties hereto and their respective heirs, administrators, executors, successors and assigns, with the same force and effect as if specifically mentioned in each instance where a party hereto is named."

[10] The contract between Tallmadge Brothers and the defendant stated in relevant part:

"FULL AND FINAL SETTLEMENT
AGREEMENT

"This Agreement is made as of the 1st day of March, 1991 by Tallmadge Brothers, Inc., a Connecticut corporation with its principal place of business at 132 Water Street, South Norwalk, Connecticut (hereinafter called 'Tallmadge') with Iroquois Gas Transmission System, L.P., a Delaware Limited partnership having its principal office at One Corporate Drive, Shelton, Connecticut (hereinafter called 'IGTS').

"Whereas, pursuant to a Certificate of Public Convenience and Necessity issued by the Federal Energy Regulatory Commission to IGTS on November 14, 1990, IGTS intends to construct and operate a natural gas transmission pipeline from the international border between the United States and Canada, through New York and Connecticut, across Long Island Sound, to Long Island, New York;

"Whereas, Tallmadge owns a perpetual franchise for the seeding, cultivation and harvesting of shellfish with respect to certain shellfish grounds off Milford, Connecticut containing approximately 561.4 acres more particularly described in Exhibit A attached hereto and made a part hereof (hereinafter called the 'Grounds');

"Whereas, IGTS proposes to construct a natural gas pipeline under portions of the Grounds and will during the period of construction temporarily disrupt the use of the Grounds by Tallmadge;

"Whereas, the construction by IGTS of its natural gas pipeline under a specified area of the Grounds will result in damages to the shellfish resources of Tallmadge;

"Whereas, Tallmadge and IGTS, after independent investigation and study by each, now wish to provide for the temporary interruption of Tallmadge's use of the Grounds and the liquidation of Tallmadge's damages resulting from IGTS's activities in connection with its natural gas transmission pipeline;

"Now, therefore, in consideration of the mutual promises and covenants contained herein, the parties agree as follows:

"1. Tallmadge hereby consents and agrees that for the period of the construction of the natural gas pipeline, which shall not exceed twelve (12) months in duration (the 'Construction Period'). Tallmadge will not make any use of the temporary 'Work Area' to be used by Iroquois. Said Work Area is that portion of the Shellfish Grounds within one hundred (100) feet on either side of the intended location of the pipeline, as shown on Schedule A hereto. Tallmadge will not make any use of such Work Area during the

release of the defendant from any and all liability "inci-

Construction Period, including without limit, the seeding, cultivation or harvesting of shellfish therein. During the Construction Period, IGTS and its agents, employees, contractors and subcontractors may construct and install a buried pipeline and all of the appurtenances or facilities useful or convenient in connection with or incidental thereto, for the transportation of gaseous or liquid hydrocarbons and any product or by-product thereof (such pipeline, appurtenances and facilities are hereinafter referred to as the 'Pipeline') under and across the oysters or the Ground in the approximate location shown on the sketch attached hereto as Exhibit B, including the creation of a trench in which the Pipeline will be buried, and the filling of the same after the completion of construction of the Pipeline.

"2. Tallmadge shall retain the right to seed, cultivate or harvest shellfish and oyster cultch in the portion of the Grounds outside the Work Area, during the Construction Period, so long as such activity does not in any way interfere with the pipeline construction.

"3. Iroquois is obligated by a permit condition imposed by the State of Connecticut, Department of Environmental Protection (DEP), to restore all disturbed oyster grounds (including those of others) after construction of the Pipeline. To comply with this condition, Iroquois will purchase oyster cultch pre-approved by Tallmadge and State of Connecticut Department of Agriculture, Aquaculture Division and transport same at its sole cost and expense to that Connecticut location designated by Tallmadge situated within the vicinity of the affected shellfish grounds. Iroquois agrees to retain Tallmadge to unload, store, and spread such cultch to comply with the permit condition; and Tallmadge agrees to do so. Iroquois will pay Tallmadge $525,000.00 for this work upon receipt of notices from: a) Tallmadge; and b) the State of Connecticut Department of Agriculture, Aquaculture Division that the grounds have been restored to their satisfaction.

"4. Simultaneously with the execution of this Agreement, IGTS has paid to Tallmadge THREE MILLION SIX HUNDRED SIXTY-ONE THOUSAND FIVE HUNDRED THIRTY-SIX ($3,661,536.00) Dollars by check, the receipt of which is hereby acknowledged, as liquidated damages for, and as full and final settlement of, all damages, claims etc. specified in paragraph 5 of this Agreement.

"5. Tallmadge hereby releases and discharges IGTS and its successors, assigns, agents, employees, contractors, and subcontractors from all actions, causes of action, debts, sums of money, agreements, promises, trespasses, damages, judgments, executions, claims and demands whatsoever, in law, admiralty or equity, which Tallmadge ever had, now has or hereafter can, shall or may have with respect to any damage to any shellfish grounds shown on Exhibit B hereto, or shellfish thereon, by reason of any matter, cause or thing whatsoever, incident to the construction of the Pipeline, and any acts in connection therewith, including, without limit, loss of or damage to oysters or other forms of shellfish that Tallmadge may have claim to, now or hereafter, loss of profits from Tallmadge's shellfish operations, or

dent to the construction of the Pipeline," Tallmadge

damage to or decreased productivity therefrom. This release shall not apply, however, to damages caused by any event occurring after the pipeline is put in service.

"6. Tallmadge represents and warrants to IGTS that (i) Tallmadge is the owner of the shellfish and oyster cultch on the Grounds and has a valid franchise estate in said Grounds, free and clear of defects and encumbrances; (ii) it has not leased or assigned such rights; (iii) it has good right and lawful authority to enter into this Agreement; and (iv) it will permit IGTS to use, possess, occupy and enjoy the Work Area during the duration of the construction, for the purposes specified in this Agreement without hinderance or molestation from it or from any person claiming by, for or under it.

"7. This Agreement contains the entire and only agreement between the parties and no oral statements or representations or prior written matter not contained in this instrument shall have any force and effect. This Agreement may only be changed, modified or discharged by an agreement in writing executed by the parties hereto.

"8. If any term, covenant, condition or provision of this Agreement or the application thereof to any person or circumstances shall, to any extent, be invalid or unenforceable, the remainder of this Agreement, or the application of such term or provision to the person or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby and each term, covenant and provision of this Agreement shall be valid and be enforceable to the fullest extent permitted by law.

"9. Tallmadge will, at any time, at the request of IGTS promptly execute an instrument, in recordable form and in a form agreeable to Tallmadge, which will constitute a short form notice of this Agreement setting forth a description of the Grounds, terms of this Agreement and such other provisions as IGTS or Tallmadge may request. IGTS or Tallmadge may at its option, record in such records as they, jointly or severally deem appropriate, such short form notice of this Agreement.

"10. All notices, requests, demands, approvals, consents and other communications authorized or appropriate hereunder shall be in writing and shall be given by mailing the same by certified mail or registered mail, return receipt requests, postage prepaid, to the respective party for whom intended, at the address first hereinabove set forth, or such other address as such party might designate by notice to the other party similarly given, and the same shall be deemed to have been received three business days after the same is deposited, postage prepaid, in the United States mail.

"11. This Agreement is made and executed in and is to be construed under the laws of the State of Connecticut.

"12. The agreements, conditions, covenants and terms herein contained shall, in every case, apply to, be binding, and inure to the benefit of the parties hereto and their respective heirs, administrators, executors, successors and assigns, with the same force and effect as if specifically mentioned in each instance where a party hereto is named."

Brothers received $3,661,536, and Sabo received $1,538,462.

Construction of the pipeline began on March 1, 1991, and continued into May of that year. In May, Bloom and Sabo each noticed that the smoothing beam was being dragged well outside the 200 foot work area described in the portion of the settlement agreements restricting the plaintiffs' shellfishing during the construction period. On May 16, Richichi mentioned to Fitzgerald that the defendant was exceeding the scope of the work area. Fitzgerald then spoke with the defendant, and in that conversation learned, for the first time, of the discrepancy between the size of the work area as defined by the restriction on the plaintiffs' shellfishing activities, and the size of the work area as specified in the agreement between the defendant and its contractors. Fitzgerald also learned at that time that the larger work area was required by federal and state agencies for environmental reasons.

In March, 1993, the plaintiffs filed the ten count, amended complaint that is the operative complaint for the purposes of this appeal. The complaint alleges, on behalf of both Tallmadge Brothers and Sabo: (1) detrimental reliance by the plaintiffs on the guarantees made by the defendant; (2) breach of contract; (3) unfair trade practices under the Connecticut Unfair Trade Practices Act (CUTPA); General Statutes § 42-110a et seq.; (4) trespass onto portions of the plaintiffs' shellfisheries that the defendant had no authority to enter; and (5) fraudulent misrepresentation. In response, the defendant filed an answer and special defenses, in which it asserted, as its main special defense, that the plaintiffs' claims were precluded by the general release provision in each of the settlement agreements, and the plaintiffs' acceptance of the liquidated damages as full and final settlement "for all damages which might occur during

construction of the pipeline . . . ." The defendant also filed a counterclaim against the plaintiffs.[11]

In March, 1996, the parties jointly agreed to submit the case for trial to a committee of the Superior Court, as provided for by § 52-425. See footnote 1 of this opinion. The parties selected former Judge Cioffi to be the committee, and authorized him: (1) to hear evidence and make a report of his factual findings; and (2) to make a " 'recommendation to the Court as to the conclusions of law to be applied [to the facts found] . . . .' " After a lengthy trial, the committee issued its findings of fact and a suggested opinion. In response to motions to correct filed by all parties, the committee heard additional evidence relating to the extent of the plaintiffs' damages and thereafter issued amended findings and an amended opinion.

The crux of the committee's findings and opinion was its conclusion that "[t]he written contract between the parties [does] not express the entire understanding or the intention of the parties. Those terms understood but not contained in the written contract were that the actual construction area for the pipeline was a 200 foot corridor (100 feet on each side of the actual transmission pipe); that construction would be confined to this 200 foot corridor; and that the only other damage that would be done to the plaintiffs' shellfish beds would be occasioned by siltation and the construction barges' anchors and cables." As a consequence of these findings, the committee concluded that "there should be a clause inserted in the contract *by implication* which specifically delineates the 200 foot path of construction with an accompanying clause that indicates that the sums paid to the plaintiffs were for the total destruction of shellfish within this area and incidental damage done to shellfish outside this area." (Emphasis added.) Hav-

---

[11] The counterclaim is not the basis for any claim by any party in this appeal.

ing implied this clause into the settlement agreements, the committee went on to hold the defendant in breach of the implied clause by reason of the dragging of the smoothing beam outside of the 200 foot work area. The committee recommended an award of damages to the plaintiffs for this breach, to be calculated by "the selling price of the [shellfish] less the associated cost of bringing the [shellfish] to market." Accordingly, the committee calculated Tallmadge Brother's damages at $282,345, and Sabo's damages at $54,000.

All parties subsequently filed objections and exceptions to the committee's findings and recommended opinion. The plaintiffs claimed that the committee had improperly: (1) based its calculation of their damages on lost profits, rather than the fair market value of the shellfish destroyed; (2) omitted from its calculations certain areas in which shellfish were lost; and (3) failed to award damages for fraudulent misrepresentation and for violation of CUTPA based on the defendant's misrepresentation of the width of the work area. The defendant claimed that the committee had improperly: (1) found that the settlement agreements did not express the entire intent of the parties; (2) admitted parol evidence to vary or contradict the terms of the settlement agreements, which were integrated and unambiguous; and (3) calculated the measure of damages to be awarded to the plaintiffs.

The trial court, *Lewis, J.*, modified the committee's findings. The court declined to adopt the committee's imputation of a missing clause into the settlement agreements. Instead, the court concluded that, because the plaintiffs were seeking compensation "for direct construction damages outside this 200 foot wide work area," the settlement agreements were *inapplicable,* and did not bar the plaintiffs' recovery. The court therefore accepted the committee's decision, albeit for a different reason. The court, however, rejected the com-

mittee's calculation of damages, and increased the awards to $3,203,852 for Tallmadge Brothers, and $355,388 for Sabo. Finally, the court declined to disturb the committee's factual finding that the plaintiffs were not entitled to an award for fraudulent misrepresentation or for damages under CUTPA.

On appeal to this court, the defendant claims that the trial court improperly: (1) construed the settlement agreements, which were unambiguous and fully integrated, in a manner inconsistent with their express language; and (2) awarded damages in excess of the amounts awarded by the committee. In their cross appeal, the plaintiffs claim that the trial court improperly: (1) failed to apply the proper measure of damages; and (2) failed to hold the defendant liable for fraudulent misrepresentation and for violation of CUTPA. We conclude that the trial court improperly construed the settlement agreements, and consequently, improperly held the defendant liable for breach of contract. We further conclude that the trial court properly refused to hold the defendant liable for either fraudulent misrepresentation or violation of CUTPA. We therefore reverse the judgment of the trial court, and direct that judgment be rendered in favor of the defendant.[12]

I

STANDARD OF REVIEW

As an initial matter, we set forth the applicable standard of appellate review. The plaintiffs argue that because the interpretation of a contract requires a search for the intent of the contracting parties, it is a question of fact, reviewable only for clear error. The defendants argue that de novo review is the proper standard, because definitive contract language deter-

_____

[12] Because we conclude that the defendant improperly was held liable for breach of contract, we do not address the parties' respective claims as to the proper measure of damages.

mines the issues in this case. We agree with the defendant.

"Although ordinarily the question of contract interpretation, being a question of the parties' intent, is a question of fact . . . [w]here there is definitive contract language, the determination of what the parties intended by their contractual commitments is a question of law. . . . *Levine* v. *Massey*, 232 Conn. 272, 277, 654 A.2d 737 (1995); see *Mulligan* v. *Rioux*, 229 Conn. 716, 740, 643 A.2d 1226 (1994), on appeal after remand, 38 Conn. App. 546, 662 A.2d 153 (1995); *Bank of Boston Connecticut* v. *Schlesinger*, 220 Conn. 152, 158, 595 A.2d 872 (1991); *Thompson & Peck, Inc.* v. *Harbor Marine Contracting Corp.*, 203 Conn. 123, 131, 523 A.2d 1266 (1987); *Bead Chain Mfg. Co.* v. *Saxton Products, Inc.*, 183 Conn. 266, 274–75, 439 A.2d 314 (1981). . . . *Pesino* v. *Atlantic Bank of New York*, 244 Conn. 85, 91–92, 709 A.2d 540 (1998)." (Internal quotation marks omitted.) *Issler* v. *Issler*, 250 Conn. 226, 235–36, 737 A.2d 383 (1999); see also 3 A. Corbin, Contracts (1960) § 554, pp. 223–25 ("[i]f the words of agreement . . . are definite and undisputed, and if there is no doubt as to the relevant surrounding circumstances, the interpretation of words is ordinarily held to be a matter for the court"); 11 S. Williston, Contracts (4th Ed. 1999) § 30:6, pp. 77–83 ("[t]he interpretation and construction of a written contract present only questions of law, within the province of the court . . . so long as the contract is unambiguous and the intent of the parties can be determined from the agreement's face").

In accordance with this principle, our recent cases have held, in a number of different contexts, that the contract language at issue was so definitive as to make the interpretation of that language a question of law subject to plenary review by this court. See *Issler* v. *Issler*, supra, 250 Conn. 236 (interpretation of written separation agreement); *Levine* v. *Advest, Inc.*, 244

Conn. 732, 746, 714 A.2d 649 (1998) (arbitration agreement); *Southeastern Connecticut Regional Resources Recovery Authority* v. *Dept. of Public Utility Control*, 244 Conn. 280, 290, 709 A.2d 549 (1998) (electricity rate contract); *Peter-Michael, Inc.* v. *Sea Shell Associates*, 244 Conn. 269, 276, 709 A.2d 558 (1998) (lease agreement); *Pesino* v. *Atlantic Bank of New York*, supra, 244 Conn. 92 (settlement agreement); *Levine* v. *Massey*, supra, 232 Conn. 278 (royalty sharing agreement); *Mulligan* v. *Rioux*, supra, 229 Conn. 740 (department of public works services contract); *Bank of Boston Connecticut* v. *Schlesinger*, supra, 220 Conn. 158 (indemnity agreement); *Thompson & Peck, Inc.* v. *Harbor Marine Contracting Corp.*, supra, 203 Conn. 131 (loan agreement).

Our case law, however, does not set forth a test by which to determine whether contract language is sufficiently definite to warrant its review as a question of law rather than as a question of fact. It is noteworthy that, in the majority of the cases considering contract interpretation a matter of law, the disputed agreement was a commercial contract between sophisticated commercial parties with relatively equal bargaining power. We noted the importance of that factor in *Bank of Boston Connecticut*, in which we stated that "[t]he defendants are effectively requesting that we rewrite their commercially sophisticated guaranty and indemnity agreement to require the plaintiff to exhaust the collateral securing the notes before pursuing its available remedy under the agreement. *The parties could have written such an agreement, but they did not do so.*" (Emphasis added.) *Bank of Boston Connecticut* v. *Schlesinger*, supra, 220 Conn. 159.

In the present case, the contracts at issue are commercial in nature and were made by sophisticated commercial parties with the advice of counsel during an extensive drafting process. Although those factors will

not be dispositive of the proper standard of review in every set of circumstances, we hold that they raise a presumption of definitiveness that, in this case, has not been rebutted by any other evidence in the record. After reviewing the record, we conclude that the parties meant what they said and said what they meant, in language sufficiently definitive to obviate any need for deference to the trial court's factual findings as to the parties' intent. We therefore will review the trial court's decision de novo.

## II

## SCOPE OF THE CONTRACTUAL RELEASE

Having delineated the proper standard of review, we turn next to the main issue in this appeal, namely, the question of the defendant's alleged liability for breach of the settlement agreements. It bears emphasis that the settlement agreements doubled the amount of the defendant's previous offers to pay damages to the plaintiffs. The trial court nonetheless concluded that the general release language in those agreements did not apply to "direct construction damages outside [the] 200 foot wide work area," and therefore held the defendant liable for the destruction of shellfish caused by the dragging of the smoothing beam beyond that area. We disagree with the trial court's conclusion concerning the scope of the release contained in the settlement agreements.

Our resolution of this issue necessarily encompasses an examination of two portions of the settlement agreements: the general release of liability; and the merger clause. The scope of the former determines whether the defendant must pay damages for its breach of contract arising out of its use of the smoothing beam. The scope of the latter determines the manner in which the parties may prove their intent in executing the settlement agreements. Because the language of the release

and the merger clause is identical in each contract, we will address the two contracts as one.

Our interpretation of these contract provisions is guided by well established principles of contract law. "A contract must be construed to effectuate the intent of the parties, which is determined from the language used interpreted in the light of the situation of the parties and the circumstances connected with the transaction. . . . [T]he intent of the parties is to be ascertained by a fair and reasonable construction of the written words and . . . the language used must be accorded its common, natural, and ordinary meaning and usage where it can be sensibly applied to the subject matter of the contract. . . . Where the language of the contract is clear and unambiguous, the contract is to be given effect according to its terms. A court will not torture words to import ambiguity where the ordinary meaning leaves no room for ambiguity . . . . Similarly, any ambiguity in a contract must emanate from the language used in the contract rather than from one party's subjective perception of the terms. *Lawson* v. *Whitey's Frame Shop*, 241 Conn. 678, 686, 697 A.2d 1137 (1997)." (Internal quotation marks omitted.) *Pesino* v. *Atlantic Bank of New York*, supra, 244 Conn. 91–92. As discussed previously, because the settlement agreements are commercial contracts containing definitive language, the determination of the parties' intent is a question of law; id., 92; and our review of the trial court's construction of the settlement agreements is plenary. *Southeastern Connecticut Regional Resources Recovery Authority* v. *Dept. of Public Utility Control*, supra, 244 Conn. 290.

A

We consider first the scope of the general release provisions. As with any question of contractual interpretation, our initial guide must be the actual words used

in the contract. The general release executed by both plaintiffs provides that they release the defendant "from all actions, causes of action, debts, sums of money, agreements, promises, trespasses, damages, judgments, executions, claims and demands whatsoever, in law, admiralty or equity . . . *by reason of any matter, cause or thing whatsoever, incident to the construction of the Pipeline, and any acts in connection therewith,* including, without limit, loss of or damage to oysters or other forms of shellfish . . . ." (Emphasis added.)

In spite of this seemingly unambiguous and unequivocal language, the trial court concluded that the release applied only to direct construction damages within the 200 foot work area, and that the damage caused by the smoothing beam outside of that area was incidental destruction not contemplated by the parties at the time when the settlement agreements were drafted. Such a tortured interpretation of the language of the release cannot be reconciled with our long-standing rule that "the language used must be accorded its common, natural, and ordinary meaning and usage where it can be sensibly applied to the subject matter of the contract." (Internal quotation marks omitted.) *24 Leggett Street Ltd. Partnership* v. *Beacon Industries, Inc.*, 239 Conn. 284, 295, 685 A.2d 305 (1996); see also 11 S. Williston, supra, § 32:3, pp. 408–11 ("[t]he plain, common or normal meaning of language will be given to the words of a contract unless the circumstances show that in a particular case a special meaning should be attached to them").

The crucial element of the release provision is the portion that precludes liability for the defendant "by reason of any matter, cause or thing whatsoever, incident to the construction of the Pipeline, and any acts in connection therewith . . . ." It is well-nigh impossible to imagine a more all encompassing release. Moreover, the release specifically mentions both damage

"incident to the construction," and "any acts in connection" with the construction. We find it impossible to square the deliberate insertion of these two phrases into the release with the trial court's conclusion that the release applied only to direct construction damages within the work area. Certainly, the act of dragging the smoothing beam was both incident to, and an act in connection with, the construction of the pipeline. After a lengthy drafting process, and on the advice of counsel, the parties deliberately chose to use those particular words in the release provision. We decline to abandon the basic principle of contract law that we construe contract language by reference to the words chosen by the parties. Especially in the context of commercial contracts, we assume that definite contract language is the best indication of the result anticipated by the parties in their contractual arrangements.

We confronted a strikingly similar issue in *Lucas* v. *Algonquin Gas Transmission Co.*, 143 Conn. 350, 122 A.2d 588 (1956). In *Lucas*, the defendant gas company, in advance of constructing a gas pipeline across the plaintiffs' property, paid the plaintiffs $3441 in consideration of a release "for all detriment, injuries and damages of whatsoever nature and character . . . incident to or in connection with the construction . . . of a certain pipe line or pipe lines to be laid on, over or through certain lands of the plaintiffs [a]s described in [the] right-of-way agreement . . . ." (Internal quotation marks omitted.) Id., 353. In the face of this release, the plaintiffs in *Lucas* asserted a claim for damage caused by the construction to lands not specifically mentioned in the right-of-way agreement. We rejected this claim, concluding that it could not be reconciled "with the unambiguous wording of both the release and the grant." Id. Although not dispositive of the proper construction of the settlement agreements in the present case, our resolution of the nearly identical factual

scenario in *Lucas* is a serious obstacle to recognition of the plaintiffs' claim.

The plaintiffs advance several arguments in support of the trial court's interpretation of the scope of the settlement agreements. None of those arguments is persuasive.

First, the plaintiffs contend that a separate provision in each of the settlement agreements manifests the parties' intent to limit the scope of the release to the 200 foot work area. The provision on which the plaintiffs rely, which is worded identically in each of the contracts, states that "[the plaintiffs] will permit [the defendant] to use, possess, occupy and enjoy the Work Area during the duration of the construction, for the purposes specified in this Agreement without hinderance or molestation from [the plaintiffs] or from any person claiming by, for or under [the plaintiffs]." The plain language of this provision, however, rebuts the plaintiffs' argument, as it represents a limitation on the rights of the *plaintiffs*, and not a limitation of the scope of the release that the plaintiffs granted to the *defendant*. Its clear purpose is to prevent the plaintiffs from hindering or molesting the defendant's construction activities during the twelve month period specified in the contracts. As such, it provides no support for the plaintiffs' claims.[13]

Second, the plaintiffs argue that to consider the agreements to be "general releases" would render the definition of the work area contained elsewhere in the agreements mere surplusage. This contention also is meritless. The settlement agreements state only that "[the plaintiffs] will not make any use of the temporary

---

[13] Significantly, the plaintiffs' brief quotes only the first portion of this provision. The plaintiffs never address the crucial language, which discusses the right of the defendant to construct the pipeline "without hinderance or molestation . . . ."

'Work Area' to be used by [the defendant]." We conclude, therefore, that the scope of the work area, defined for the purpose of limiting the *plaintiffs'* rights within that space for the duration of the pipeline construction, does not serve as a limitation on the rights of the defendant as delineated by the release granted to the defendant by the plaintiffs.

B

Despite the definite and unambiguous language of the settlement agreements, the trial court concluded, and the plaintiffs now argue, that certain extrinsic evidence, specifically the conduct of the parties during the negotiation process and subsequent to the defendant's dragging of the smoothing beam, supports their contention that the general release language in the agreements does not apply to direct construction damage outside of the work area. The trial court's reliance on such extrinsic evidence to determine the parties' intent cannot be reconciled with the merger clause contained in the contracts and, therefore, cannot be squared with our well settled principles of contract law.

We long have held "that when the parties have deliberately put their engagements into writing, in such terms as import a legal obligation, without any uncertainty as to the object or extent of such engagement, it is conclusively presumed, that the whole engagement of the parties, and the extent and manner of their understanding, was reduced to writing. After this, to permit oral testimony, or prior or contemporaneous conversations, or circumstances, or usages [etc.], in order to learn what was intended, or to contradict what is written, would be dangerous and unjust in the extreme." (Internal quotation marks omitted.) *TIE Communications, Inc.* v. *Kopp*, 218 Conn. 281, 288, 589 A.2d 329

(1991). Although there are exceptions to this rule,[14] we continue to adhere to the general principle that the unambiguous terms of a written contract containing a merger clause may not be varied or contradicted by extrinsic evidence.

In order for the bar against the introduction of extrinsic evidence to apply, the writing at issue must be integrated, that is, it must have been intended by the parties "to contain the whole agreement"; *Associated Catalog Merchandisers, Inc.* v. *Chagnon*, 210 Conn. 734, 740, 557 A.2d 525 (1989); and to be "a final expression of one or more terms of [the] agreement . . . ." (Citation omitted; internal quotation marks omitted.) Id.; see also 3 A. Corbin, supra, § 539, p. 77 ("[w]hen an agreement has been reduced to writing, one that is assented to as the full and operative statement of terms, the writing has been described as an 'integration' "); 11 S. Williston, supra, § 33:14, p. 612 (integrated agreement exists "when [the parties] mutually consent to a certain writing or writings as the final statement of the agreement or contract between them"). In this case, there can be little doubt that the parties, whatever their conduct during the negotiations, and whatever their protestations thereafter, intended the settlement agreements to be the complete and final expression of their contractual relationships.

The expression of that intent in these agreements may be found in their merger clauses, which state: "This Agreement contains the entire and only agreement between the parties and no oral statements or represen-

---

[14] For example, extrinsic evidence may be admissible: "(1) to explain an ambiguity appearing in the instrument; (2) to prove a collateral oral agreement which does not vary the terms of the writing; (3) to add a missing term in [a] writing which indicates on its face that it does not set forth the complete agreement; or (4) to show mistake or fraud." (Internal quotation marks omitted.) *TIE Communications, Inc.* v. *Kopp*, supra, 218 Conn. 288–89.

tations or prior written matter not contained in this instrument shall have any force and effect. This Agreement may only be changed, modified or discharged by an agreement in writing executed by the parties hereto." Although the question of what weight should be given to a merger clause has prompted a number of differing views,[15] much of this disagreement has occurred in the context of unequal bargaining power between the parties, fraud, duress, or contracts in contravention of public policy. See 11 S. Williston, supra, § 33:22, p. 674. The general rule of contract law remains that "a [merger] clause . . . is likely to conclude the issue [of] whether the agreement is completely integrated." 2 Restatement (Second), Contracts § 216, comment (e) (1981).

None of the concerns that might call the merger clauses into question is present in this case. As discussed previously, the parties here possessed relatively equal bargaining power, and they executed the settlement agreements only after a lengthy drafting process during which they had received the advice of counsel. We conclude, therefore, that the parties' insertion of the merger clauses into the settlement agreements is

---

[15] For example, some jurisdictions have held that the insertion of a merger clause into a contract constitutes conclusive evidence that the parties intended their agreement to be integrated. See, e.g., *Bilmar Drilling, Inc.* v. *IFG Leasing Co.*, 795 F.2d 1194, 1197–98 (5th Cir. 1986); *John Harris & Associates, Inc.* v. *Day*, 916 F. Sup. 651, 656 (E.D. Mich. 1996); *Crown Pontiac, Inc.* v. *McCarrell*, 695 So. 2d 615, 618 (Ala. 1997); *Nelson* v. *Elway*, 908 P.2d 102, 107 (Colo. 1995); see also *Green River Valley Foundation, Inc.* v. *Foster*, 78 Wash. 2d 245, 473 P.2d 844 (1970). Other jurisdictions, however, have held that the existence of a merger clause is merely presumptive evidence of the parties' intent. See, e.g., *Steinke* v. *SunGard Financial Systems, Inc.*, 121 F.3d 763, 769 (1st Cir. 1997); *Bakery & Confectionery Union & Industry International Pension Fund* v. *Ralph's Grocery Co.*, 118 F.3d 1018, 1024 (4th Cir. 1997); *Sicor Ltd.* v. *Cetus Corp.*, 51 F.3d 848, 859 (9th Cir. 1995); *Howard University* v. *Good Food Services, Inc.*, 608 A.2d 116, 127 (D.C. 1992); *Franklin* v. *White*, 493 N.E.2d 161, 166 (Ind. 1986); *Lapierre* v. *Cabral*, 122 N.H. 301, 306, 444 A.2d 522 (1982); *Herman Oil, Inc.* v. *Peterman*, 518 N.W.2d 184, 189 (N.D. 1994).

conclusive evidence of their intent to create fully integrated contracts, and that the trial court's subsequent consideration of extrinsic evidence was improper.

## C

A merger clause, of course, will not operate as a bar to the introduction of evidence of fraud by one of the contracting parties. The opportunity to present evidence of fraud long has been recognized as an exception to the parol evidence rule. See *TIE Communications, Inc.* v. *Kopp*, supra, 218 Conn. 289; 2 Restatement (Second), supra, § 214, comment (c) ("[proof of] fraud, duress, mistake, or the like . . . [is] not affected by a 'merger' clause"). We do not intend our opinion in this case to alter that exception in any way.

The plaintiffs have raised, in their cross appeal, the specter of fraud in the contracting process in this case. The plaintiffs argue that the trial court improperly found that the defendant had not committed common-law fraudulent misrepresentation, or deceptive or unfair trade practices under CUTPA. This claim in unavailing.

It is well settled that whether a defendant's acts constitute fraudulent misrepresentation, or deceptive or unfair trade practices under CUTPA, is a question of fact for the trier, to which, on appellate review, we accord our customary deference. See *Abrahams* v. *Young & Rubicam, Inc.*, 240 Conn. 300, 307, 692 A.2d 709 (1997). Our careful review of the record in this case reveals no justification for overturning the trial court's conclusion that no CUTPA violation or common-law fraud took place.

## III

## CONCLUSION

In sum, we view this case as an opportunity to reaffirm the wisdom of our earlier admonition that "[c]ourts

do not unmake bargains unwisely made. Absent other infirmities, bargains moved on calculated considerations, and whether provident or improvident, are entitled nevertheless to sanctions of the law. . . . Although parties might prefer to have the court decide the plain effect of their contract contrary to the agreement, *it is not within its power to make a new and different agreement; contracts voluntarily and fairly made should be held valid and enforced in the courts.*" (Citation omitted; emphasis added.) *Robert Lawrence Associates, Inc.* v. *Del Vecchio,* 178 Conn. 1, 21–22, 420 A.2d 1142 (1979). The parties in this case entered into sophisticated and carefully crafted commercial contracts from positions of relative equality, without the improper influence of fraud or duress. Even if the result of the fair and logical enforcement of those unambiguous agreements seems unduly to burden one of the parties, we decline to embark a voyage into uncharted waters in which untrammeled and unrestrained judicial revisionism would depart significantly from an aspect of contract law upon which contracting parties reasonably can be assumed to have relied for many years.

To put it succinctly, settlement agreements will not serve their purpose of putting opposing claims to rest if, despite a fairly negotiated comprehensive and unambiguous merger clause, they remain subject to judicial revision. The consideration for the full and final settlement agreements in these cases was the defendant's payment of double the amounts that it previously had offered the plaintiffs to compensate them for the losses that they had suffered. Having performed its part of the bargain, the defendant was entitled to hold each of the plaintiffs to the contractual obligation to release the defendant from further liability.

The judgment is reversed and the case is remanded with direction to render judgment for the defendant.

In this opinion BORDEN, NORCOTT and KATZ, Js., concurred.

MCDONALD, C. J., dissenting. I do not agree that the agreements between the parties bar the plaintiffs from recovering for damages to their shellfish grounds as a result of pipeline construction outside the temporary work area described in the agreements.

The defendant's purpose was to lay a pipeline across the plaintiffs' shellfish grounds. For that, the defendant sought permission to build the pipeline in a 200 foot wide temporary work area, to dig a trench in the center of the work area, lay the pipeline in the trench, and smooth it over, killing all the shellfish there. The agreements specifically recognized that the work would temporarily disrupt the plaintiffs' use of the grounds. The agreements were "to provide for the temporary interruption of [the plaintiffs'] use of the Grounds and the liquidation of [the plaintiffs'] damages resulting from [the defendant's] activities in connection with its . . . pipeline . . . ." After obtaining the agreements, the defendant unilaterally widened the temporary work area another 100 feet.

The majority observes that both parties "meant what they said and said what they meant . . . ." As far as the defendant was concerned, however, the agreements meant what the defendant chose them to mean. Unbeknown to the plaintiffs, "200 feet" thereby became 300 feet. As Alice was told in Wonderland at a mad tea party, saying what one means is " 'Not the same thing a bit!' " as meaning what one says. L. Carroll, The Annotated Alice (Meridian 1960 Ed.) c. 7, p. 95. When Alice went through the looking glass, she learned that when one uses a word it may mean just what one chooses it to mean, "neither more nor less." Id., p. 87.[1]

---

[1] For use of an Alice in Wonderland analysis to explore other legal curiosities, see M. Ghetti, "Seizure Through the Looking Glass: Constitutional Analysis in Alice's Wonderland," 22 S.U. L. Rev. 231 (1995).

Just because this case takes us underwater does not justify going "through the looking glass" to define "200 feet" as 300 feet. In the real world of shellfish farming and pipeline construction, there was no meeting of the minds that the temporary work area was 300 feet wide. In interpreting contract terms, "[t]he intent of the parties is to be ascertained by a fair and reasonable construction of the written words and . . . the language used must be accorded its common, natural, and ordinary meaning and usage where it can be sensibly applied to the subject matter of the contract." (Internal quotation marks omitted.) *Lawson* v. *Whitey's Frame Shop*, 241 Conn. 678, 686, 697 A.2d 1137 (1997). These agreements should be interpreted in the real world and not in Wonderland or beyond the looking glass. Otherwise, such semantics will destroy the law of contracts itself.

The majority concludes by saying that it will so enforce the agreements even if it "seems unduly to burden" the plaintiffs. The reality is that the plaintiffs will now suffer very substantial damage to their properties, perhaps in the millions of dollars,[2] without any compensation.

Accordingly, I say I dissent and I mean to dissent.

---

[2] In view of the majority's resolution of this case, there would be no reason to review the issue of the proper measure of damages.