[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The plaintiff, Deborah Hengen, brings this action against the defendants, Emer Coyne and Thomas Francis, alleging breach of contract, tortious breach of contract. and statutory theft. Hengen claims that the defendants entered into a contract to board and train her horse in exchange for a share of the profits from the sale of the horse, and that the defendants breached the contract by selling Hengen's horse without compensating her. Coyne, counterclaimed for damages incurred as a result of boarding and caring for the horse. Francis has denied the allegations of the complaint.
 FACTS
Hengen has been involved with the ownership or riding of horses for approximately twenty years. During the last fifteen years, Hengen has been involved in horsetrading — she would purchase thoroughbred horses that were retired from racing, train those horses for showing or jumping and then resell the horses for a profit. Francis, became involved in the horse business in 1989 when he purchased the Hawthorne Farm in Willington, Connecticut. At the farm. Francis boarded horses and provided training facilities for the horses and their riders. He leased some of the stalls to the owners of horses. He also offered riding classes at Hawthorne Farm.
Francis met Coyne, in 1989. At that time. Francis contracted with Coyne to provide lessons and, in general, to supervise the stable. Coyne graduated from the University of Connecticut with a degree relating to horses and veterinary sciences. Since as early as 1990, Coyne has been involved in owning, showing, valuation and training of horses and training riders. Thus, the court has before it, three individuals who have been active in the horse business for a significant period of time before the events that give rise to this litigation.
In April of 1994, Hengen purchased a thoroughbred horse, Princess,[1]
CT Page 16480 for $4,500.00. Hengen planned to use Princess as a show horse and a jumper. On the third Saturday of March in 1995, Hengen's daughter was riding Princess in the "Training Show." The Hengens were having difficulty getting the horse to jump. As described by Coyne, the horse was interested in running, not cantering or jumping. At the "Training Show," Hengen met with Coyne and Francis and the parties discussed having Coyne and Francis board and train Princess and ultimately sell the horse.[2] Thereafter, Coyne and Francis took Princess from the show to Hawthorne Farm and commenced to board and train Princess.
Approximately one year later, the parties reduced their agreement to writing. The written agreement, dated March 16, 1996, describes its purpose as follows: "Tom Francis and Emer Coyne agree to make the best effort to sell said horse on behalf of all parties." (Plaintiffs exhibit 2) Coyne and Francis agreed to board, provide veterinary care, train, exercise, show and market Princess at their expense. The agreement set a proposed offering price of $12,000 that could only be modified by agreement of all parties. In return for these services, Hengen agreed that the defendants would receive "one half of the profit on said horse over and above the sum of $4500 which was paid originally for said horse by Deborah Hengen." The contract had an addendum in Hengen's handwriting that the agreement was "to be reviewed on 8/1/97." The defendants performed their responsibilities under the March 16, 1996, agreement through August 1, 1997, but no buyer for Princess had been found as of that date.
Shortly before the review date of the agreement, on July 25, 1997, Francis met with Hengen and he told her that he had sold his farm and that he "was out of the horse business." He advised Hengen to speak with Coyne and further told her that Princess would have to be moved from Hawthorne Farm on or before August 1, 1997. Coyne testified that she asked Hengen to take Princess during the last week of July, 1997, because she was concerned about who would pay for the boarding and care of the horse. Hengen did not respond to Coyne and drove away from the Hawthorne Farm. Although Hengen had boarding facilities available to her at her home for Princess, she made no arrangements to move the horse. No further communication took place between Coyne and Hengen regarding the care of Princess prior to August 1, 1997. Shortly before the Hawthorne Farm move out date of August 1, 1997, Coyne voluntarily moved Princess and several other horses that she had been working with to the Quintree Farm in Tolland, Connecticut.
The parties did not review the agreement on August 1, 1997, as provided in the agreement. Hengen, the author of the disputed phrase in the contract, "to be reviewed on 8/1/97," indicated that she did not know the CT Page 16481 intent or the meaning of the phrase and presumed that if there was no review, the contract remained in effect. Francis believed that the "review" language meant that if there was no agreement to continue, the agreement was "null and void." Coyne, like Francis, understood that if there was no review of the contract in August of 1997, that the agreement was to be "null and void." She and Francis "weren't going to keep paying expenses. She (Hengen) would have to take the horse home or start paying board."
Throughout the fall of 1997, Hengen and Coyne attempted to communicate with each other, but with no success. Each party claims to have left messages for the other. The lack of communication was caused by several factors. These factors include that in September of 1997, Hengen was injured while riding another horse and was hospitalized for several weeks. Hengen also moved and did not provide Coyne with her new address.
During this time, Coyne paid board and veterinarian fees to the Quintree Stables relating to Princess. The monthly boarding fees were between $350.00 to $400.00 per month. She also continued to train and show the horse and advertise the horse for sale. Sometime later, Princess was moved by Coyne from the Quintree Stables to the Legends Farm. Coyne paid for the board and veterinary fees for Princess at the Legends Farm. The monthly boarding fees at the Legends Farm were $500.00 per month. Coyne also continued to train and show the horse. In total, Coyne claims to have spent the following sums on Princess since August 1, 1997:
 Board at Quintree and Legends Farms: $10,675.00 Blacksmith 1,400.00 Veterinary Bills 1,165.10 Showing Expenses 867.00
Total $14,107.10
Coyne never sent a bill for any of these costs relating to Princess to Hengen. Coyne never consulted with Hengen regarding the treatment of degenerative joint disease in Princess's hocks.
Hengen testified that she was aware that Princess had been moved from the Hawthorne Farm to the Quintree Stables. She visited Quintree several times and observed that the horse appeared in good shape. During these visits, for various reasons, she did not to speak with Coyne. Hengen also stated that she was aware that Princess was moved to the Legends Farm. She visited the horse there on several occasions, observed that the horse was in good shape, but again did not speak with Coyne. CT Page 16482
At the Pines Horseshow in the summer of 1998, Hengen and Coyne encountered dne another and finally a conversation took place. Both parties recall the meeting at the Pines Horseshow but disagree about the content of their conversation. Coyne was mounted on a horse preparing to enter the show ring when she and Hengen had a conversation. During this conversation, Coyne stated to Hengen, "you're into me for a lot of money," to which Hengen responded, "I don't have money to give you. . . . I assumed you knew I was walking away from Princess." There were two independent witnesses to this conversation that confirm the substance of the conversation, as described by Coyne. Coyne felt that she had been given Princess.
Prior to September 5, 1999, Coyne arranged for the sale of, and subsequently sold Princess to Tracy Hudson for the sum of $4,500.00. (Defendants Exhibit 1) She retained all of the sale proceeds. On September 9, 1999, Hengen showed up at the Legends Farm with her horse trailer and demanded for the first time that Princess be returned to her. Since Princess had already been sold, this law suit ensued.
 ANALYSIS
In the first count, Hengen alleges that the parties entered into a binding written contract on March 16, 1996. Pursuant to the agreement, Francis and Coyne would provide services in exchange for profits from the sale of the horse. According to the complaint, Coyne and Francis breached the contract in September of 1999, when Coyne sold Princess.
It is undisputed that a contract existed between the parties from March 16, 1996 and August 1, 1997. It is also undisputed that each party met their contractual obligations during that time period. The key to determining whether the plaintiff is entitled to damages based upon a contract theory of recovery is the meaning of the words "to be reviewed on 8/1/97."
"A contract must be construed to effectuate the intent of the parties, which is determined from the language used interpreted in the light of the situation of the parties and the circumstances connected with the transaction. . . . [T]he intent of the parties is to be ascertained by a fair and reasonable construction of the written words and. . . the language used must be accorded its common, natural, and ordinary meaning and usage where it can be sensibly applied to the subject matter of the contract. (Internal quotation marks omitted.) Tallmadge Bros., Inc. v.Iroquois gab Transmission System, L.P., 252 Conn. 479, 498, 746 A.2d 1277
(2000). CT Page 16483
"In determining whether a contract is ambiguous, the words of the contract must be given their natural and ordinary meaning. . . . [A] contract is ambiguous if the intent of the parties is not clear and certain from the language of the contract itself. [A]ny ambiguity in a contract must emanate from the language used by the parties. . . . If the language of the contract is susceptible to more than one reasonable interpretation, the contract is ambiguous. (Citations omitted; internal quotation marks omitted.) United Illuminating Co. v.Wisvest-Connecticut, LLC, 259 Conn. 665, 670-71, 791 A.2d 546 (2002). "[I]t is generally accepted. . . when two or more meanings may fairly be given to language in a contract, the language is to be construed against the one who drew it. . . and, likewise, the language of a contract istypically construed most strongly against the party whose language it is and for whose benefit it was inserted . . . however, . . . [b]efore this rule of construction may be applied, there must be a determination that the terms of the contract are actually ambiguous." (Citation omitted; emphasis in original; internal quotation marks omitted.) Dainty RubbishService, Inc. v. Beacon Hill Assn., Inc., 32 Conn. App. 530, 533,630 A.2d 115 (1993).
The court finds that the contract language "to be reviewed on 8/1/97" is ambiguous. Since Hengen is the author of the language of the contract creating the review date of August 1, 1997, it is appropriate to construe that language against her. Hengen has not offered any interpretation of the language to counter the interpretation offered by the defendants. Moreover, an interpretation of the "review" language terminating the agreement if no review is conducted would render the terms of the contract reasonable rather than unreasonable. If the "review" clause is not interpreted as terminating the contract, then for so long as Hengen avoided reviewing the contract she would be entitled to free board and care for her horse from the defendants. Hengen knew or should have reasonably understood that Francis was no longer in the horse business based upon her knowledge of his sale of the Hawthorne Farm as well as his conversation with her. Further Hengen refused to participate in a review of the contractual relationship when Coyne requested her to remove Princess from the Hawthorne Farm by August 1, 1997. The import of this request was that the agreement would have to terminate or that it would have to be revised. Based on the testimony of the witnesses and rules of contract construction, the court finds that there was no review of the contract terms as called for by the agreement and that each of the defendants communicated to Hengen that they were unwilling or unable to continue under the prior terms of the agreement. The contract therefore terminated on August 1, 1997. See Talimadge Bros., Inc. v. Iroquois GasTransmission System, L.P., supra, 252 Conn. 498. Because the March 16, 1996 contract terminated on August 1, 1997 there is no recovery for the CT Page 16484 plaintiff on the first count of her complaint.
In the second count of her complaint, Hengen alleges that the defendants' actions with respect to the alleged breach of contract, showed reckless indifference to her rights or were intentional or wanton. This is a theory of recovery sounding in tort and based upon an implied covenant of good faith and fair dealing. The conduct complained of is Coyne's sale of Princess in September of 1999 and Coyne's failure to pay over to Hengen all of the proceeds of that sale.
"Breach of contract founded on tortious conduct may allow the award of punitive damages. Such tortious conduct must be alleged in terms of wanton and malicious injury, evil motive and violence, for punitive damages may be awarded only for outrageous conduct, that is, for acts done with a bad motive or with a reckless indifference to the interests of others. . . . Thus, there must be an underlying tort or tortious conduct alleged and proved to allow punitive damages to be granted on a claim for breach of contract, express or implied." (Citation omitted; internal quotation marks omitted.) L.F. Pace Sons, Inc. v. Travelers Indemnity Co.,9 Conn. App. 30, 48, 514 A.2d 766 (1986).
The issue presented by the second theory of recovery requires the court to focus on the conduct of the parties and the rights of the parties, in, and to the horse after the termination of their written contract. Was the import of Mrs Hengen's conduct consistent with a claim of ownership of the horse or that of abandonment of her rights in the horse?
"Abandonment in its general sense is the intentional relinquishment of a known right." (Internal quotation marks omitted.) Sharkiewicz v.Lepone, 139 Conn. 706, 707, 96 A.2d 796 (1953). "Abandonment of personal property such as a [horse] requires an intention to abandon or relinquish accompanied by some act or omission to act by which such an intention is manifested and is a question of fact. . . ." (Internal quotation marks omitted.) Sanchez v. Forty's Texaco Service, Inc., 5 Conn. App. 438,440, 499 A.2d 436 (1985).
Immediately prior to and subsequent to August 1, 1997, Hengen avoided the "review" called for by written agreement. In the absence of any agreement, it is clear that Hengen would have had to pay for the boarding and training of Princess. From the testimony of the parties, the boarding expenses would have cost between $3,600 and $6,000 per year.
The conduct of Hengen, including, her failure to respond to Coyne's demand that Hengen take Princess from Hawthorne Farm on or before August 1, 1997, her failure to take steps to communicate with Coyne about their CT Page 16485 respective obligations towards Princess, her failure to wait to speak with Coyne when Hengen "visited Princess" at Quintree Stables and Legends Farm, and her expressed intent at the Pines Horseshow in the summer of 1998, amounted to an intent to relinquish and thus an abandonment of the horse. See Sanchez v. Forty's Texaco Service, Inc., supra,5 Conn. App. 440.
Thus, the plaintiff cannot recover under her second theory of recovery because she had abandoned the horse. Moreover, the conduct of the parties, under the circumstances, does not demonstrate that Coyne acted outrageously.
In the third count, Hengen alleges that the sale of Princess constituted statutory theft. Specifically, she alleges that Coyne's failure to notify her of the sale of Princess showed her intent to permanently deprive Hengen of her property.
"Statutory theft under § 52-564 is synonymous with larceny under General Statutes § 53a-119. . . . Pursuant to § 53a-119, [a] person commits larceny when, with intent to deprive another of property or to appropriate the same to himself or a third person, he wrongfully takes, obtains or withholds such property from an owner. By comparison, [c]onversion is an unauthorized assumption and exercise of the right of ownership over goods belonging to another, to the exclusion of the owner's rights. . . . In addition, conversion requires that the owner be harmed as a result of the unauthorized act. . . . Conversion may arise subsequent to an initial rightful possession. . . . Conversion can be distinguished from statutory theft as established by § 53a-119 in two ways. First, statutory theft requires an intent to deprive another of his property; second, conversion requires the owner to be harmed by a defendant's conduct. Therefore, statutory theft requires a plaintiff to prove the additional element of intent over and above what he or she must demonstrate to prove conversion." (Citations omitted; internal quotation marks omitted.) Suarez-Negrette v. Trotta, 47 Conn. App. 517, 520-21,705 A.2d 215 (1998).
Given the court's finding that Hengen had abandoned Princess at the Pines Horseshow, there can be neither conversion nor statutory theft. Moreover, even if Hengen had not abandoned the horse, the court could not find that Coyne had the requisite intent to deprive as required for statutory theft.
Coyne counterclaims for expenses that she incurred while retaining possession of Princess, relying on the equitable theory of quantum meruit. At trial, Coyne presented evidence of various veterinary and CT Page 16486 boarding fees for the period of time from August 1, 1997, until September 1, 1999.
"Quantum meruit is the remedy available to a party when the trier of fact determines that an implied contract for services existed between the parties, and that, therefore, the plaintiff is entitled to the reasonable value of services rendered. . . . Such contracts are determined from evidence of the parties' course of conduct which implies a promise to pay for the services rendered." Biller Associates v. Peterken, 58 Conn. App. 8,16, 751 A.2d 836, cert. denied, 254 Conn. 914, 759 A.2d 506 (2000).
After August 1, 1997, both Hengen and Coyne acted as though Princess had been abandoned by Hengen. Coyne voluntarily moved the horse from the Hawthorne Farm to the Quintree Farm without the express consent of Hengen. Coyne could have simply left the horse at the Hawthorne Farm and let Hengen resolve the situation with the new owner of Princess. This conduct does not support an inference that Hengen would pay for the board and care of Princess. It evidences Hengen's intent to avoid those obligations.
Likewise, Coyne did not act as though she expected payment from Hengen. She did not send bills. She did not pursue contact with Hengen. She never consulted with Hengen regarding the treatment of degenerative joint disease in Princess's hocks. Once the conversation at the Pines Horseshow took place she could not have an reasonable expectation of payment. She retained the proceeds from the sale of the Horse as if it were her own. Conceivably, she could have sought relief under the lien authorized by General Statutes § 49-70[3] but did not do so.
The court finds that, based on the evidence, Hengen did not impliedly promise to pay Coyne for the boarding and veterinarian services that Coyne provided for Princess. Accordingly, there was no implied contract and Coyne is not entitled to any equitable remedy. Judgement may enter for the defendants on the plaintiffs complaint and for the plaintiff on the defendant's counterclaim.
 ___________________ Cosgrove, J.