[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION ON DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT
Buell Industries, Inc. ("Buell"), a Delaware corporation, filed an action to determine its rights in connection with certain costs it claims it has expended and will expend for the investigation and remediation of pollutant contamination at its Anchor Stampings ("Anchor") and Highland Manufacturing ("Highland") facilities located in Waterbury, Connecticut. From February 1, 1975 through February 1, 1986, the defendant, Federal Insurance Company ("Federal"), sold primary comprehensive general liability ("CGL") insurance policies to Buell. From February 1, 1980 through February 1, 1985, the defendant, Chicago Insurance Company ("Chicago"), sold umbrella liability insurance policies to Buell. Buell claims it has suffered and will suffer "property damage" and "personal injuries", as defined in the provisions of the policies issued by Federal and Chicago.[1]
Buell requests that this court enter a declaratory judgment determining that Federal and Chicago are jointly and severally liable to reimburse Buell for all sums it has paid for investigation and remediation as well as for all sums Buell will in the future be required to pay for investigation and remediation with respect to the Anchor and Highland sites. Additionally, Buell seeks damages in amounts found to be due and owing at trial.
The defendants filed answers with several special defenses, one of which claims that any property damage is expressly excluded from coverage under the policies at issue pursuant to a "pollution exclusion" clause.
Federal and Chicago have filed motions for summary judgment on various issues, claiming that: 1) none of Buell's claims constitute "personal injury" claims as that term is CT Page 9627 defined in the policies; 2) the pollution exclusion clause precludes coverage; 3) sums allegedly expended were ordinary business expenses and not "damages" as required by the policies; and 4) a pro rata allocation would preclude the policies underlying those issued by the excess carrier (Chicago) from being exhausted.
"Summary judgment shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. . . In deciding a motion for summary judgment, the trial court must view the evidence in the light most favorable to the nonmoving party. Although the party seeking summary judgment has the burden of showing the nonexistence of any material fact. . . a party opposing summary judgment must substantiate its adverse claim by showing that there is a genuine issue of material fact together with the evidence disclosing the existence of such an issue. . . It is not enough, however, for the opposing party merely to assert the existence of such a disputed issue. Mere assertions of fact. . . are insufficient to establish the I existence of a material fact and, therefore, cannot refute evidence properly presented to the court [in support of a motion for summary judgment]." (Citations omitted; internal quotation marks omitted.) Home Ins. Co. v. Aetna Life Casualty Co.,235 Conn. 185, 202-203, 663 A.2d 1001 (1995). "A "material' fact has been defined adequately and simply as a fact which will make a difference in the result of the case." Catz v. Rubenstein, 201 Conn. 39, 48, 513 A.2d 98
(1986).
 PERSONAL INJURY CLAIMS
In two of the remaining four counts, counts five and ten, Buell claims that the personal injury provisions of the Federal and Chicago policies provide coverage for the expenses incurred and to be incurred in connection with the investigation and remediation of contamination at the Anchor and Highland facilities. More specifically, Buell claims the Federal policies' definition of "personal injury" as "wrongful entry or eviction, or other invasion of the right of private occupancy. . . which occurs during the policy period" and the Chicago policies' definition of personal injury" as "wrongful eviction, wrongful entry" encompass the damage alleged to have occurred and which will occur as the result of the discharge of various pollutants at these sites.
The Federal CGL policies, covering the period February 1, 1975 through February 1, 1986, each contain the following coverage clause:
The company will pay on behalf of the insured all sums CT Page 9628 which the insured shall become obligated to pay as damages by reason of liability to which this insurance applies, imposed by law or assumed by the insured under any written contract, for bodily injury, property damage or personal injury caused by an occurrence and the company shall have the right and duty to defend any suit against the insured seeking damages on account of such bodily injury, property damage or personal injury, even if any of the allegations of the suit are groundless, false or fraudulent. . .
The Chicago umbrella policies, covering the period February 1, 1980 through February 1, 1985, each contain the following coverage claim:
 The company agrees to indemnify the insured for all sums which the insured shall become obligated to pay as damages, direct or consequential, and expenses, all as hereinafter defined as included within the term ultimate net loss, by reason of liability
(a) imposed upon the insured by law, or
 (b) assumed by the named insured, or by any officer, director, stockholder or employee thereof while acting within the scope of his duties as such, under any contract or agreement, because of personal injury, property damage, or advertising liability caused by or arising out of an occurrence which takes place during the policy period anywhere in the world.
The plaintiff and the moving defendants all agreed, at the time of argument on these motions, that there are no factual issues involved with respect to this particular issue and that whether the claims of Buell constitute "personal injury" claims as that term is defined in the policies is a matter of law to be decided by this court. "It is the function of the court to construe the provisions of the contract of insurance." Flint v. Universal Machine Co., 238 Conn. 637, 642,679 A.2d 929 (1996), quoting from Gottesman v. Aetna Ins. Co.,177 Conn. 631, 634, 418 A.2d 944 (1979). "Unlike certain other contracts. . . where. . . the intent of the parties and thus the meaning of the contract is a factual question. . . construction of a contract of insurance presents a question of law for the court. . ." (Citations omitted.) Aetna Life Casualty Co. v. Bulaong, 218 Conn. 51, 58,588 A.2d 138 (1991).
Buell's brief in opposition to these motions for summary judgment basically equates "trespass" and "nuisance" with "wrongful entry" and CT Page 9629 "wrongful eviction", or claims that such actions are encompassed within the phrase "invasion of the right of private occupancy." Further, Buell cites to extensive drafting history in an effort to persuade the court that the insurance industry considered personal injury coverage to extend to property damage caused by pollution. Connecticut has no appellate case law on this issue.
The terms of an insurance policy are to be construed according to the general rules of contract construction. Heyman Associates No. 1 v.Insurance Co. of Pennsylvania, 231 Conn. 756, 769-770, 653 A.2d 122
(1995). "The determinative question is the intent of the parties, that is, what coverage the. . . [insured] expected to receive and what the [insurer] was to provide, as disclosed by the provisions of the policy."Marcolini v. Allstate Ins. Co., 160 Conn. 280, 283, 278 A.2d 796 (1971). "If the terms of the policy are clear and unambiguous, then the language from which the intention of the parties is to be deduced, must be accorded its natural and ordinary meaning." Heyman Associates, supra, 770. "[C]ourts cannot indulge in a forced construction ignoring provisions or so distorting them as to accord a meaning other than that evidently intended by the parties." Plainville v. Travelers IndemnityCo., 178 Conn. 664, 675, 425 A.2d 131 (1979). The court in this case finds the language in the subject insurance contracts regarding personal injury claims to be clear and unambiguous and, therefore, finds it unnecessary to consider the extensive drafting history as to these provisions submitted by Buell. Heyman Associates, supra, 781.
"It is axiomatic that a contract of insurance must be viewed in its entirety, and the intent of the parties for entering it derived from the four corners of the policy." Flint v. Universal Machine Co., 238 Conn. 637,643, 679 A.2d 929 (1996). In each of the defendants' policies, there is a pollution exclusion clause in addition to the provisions concerning personal injury claims. A superior court decision, Linemaster SwitchCorp. v. Aetna Life Casualty Corp., No. CV-91-0396432-S (July 31, 1995), addressed the same issue now raised before this court. The policy language was identical, and the plaintiff claimed the contamination from pollutants constituted a wrongful entry or eviction or other invasion of the right of private occupancy. After an extensive discussion, Judge Corradino rejected plaintiffs position and concluded that such an interpretation would render the "occurrence" requirement and the pollution exclusion clause meaningless.
This court concludes, in order to give effect to all of the provisions in the insurance contract, that "personal injury" claims do not consist of alleged property damage caused by pollutants. Moreover, although plaintiff argues that "trespass" and "nuisance" are basically synonymous with "wrongful entry or eviction or other invasion of the right of CT Page 9630 private occupancy", the court disagrees. The contract language is clear and does not incorporate the words "trespass" or "nuisance" in the definition of personal injury. In interpreting a contract, a court cannot add new or different terms. Pesino v. Atlantic Bank of New York,244 Conn. 85, 93,709 A.2d 540 (1998); Cirrito v. Turner ConstructionCo., 189 Conn. 701, 706-707, 458 A.2d 678 (1983).
For these reasons, the court finds as a matter of law that the plaintiffs claims do not fall within the "personal injury" provisions of the defendants' policies. Accordingly, the defendants' motions for summary judgment are granted as to counts five and ten of the revised complaint.
POLLUTION EXCLUSION CLAUSE
In counts four and nine, the remaining two counts of the revised complaint, Buell claims that the property damage provisions of the defendants' policies provide coverage for the expenses incurred and to be incurred in connection with the investigation and remediation of contamination at the Anchor and Highland facilities (see preceding section for language of those provisions). The defendants claim that the pollution exclusion clauses in their policies expressly preclude recovery for any such sums under the circumstances of this case.
Federal's policies exclude from coverage any "bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acid, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any watercourse or body of water; but this exclusion does not apply if such, discharge, dispersal, release or escape is sudden and accidental." Chicago's policies are nearly identical, except that the phrase "personal injury" is used instead of the phrase "bodily injury". Buell contends that its claims are covered under the defendants' policies because the discharges resulting in the alleged contamination were "sudden and accidental".
Buell urges this court to interpret "sudden and accidental" to mean "unperceived and unintended". In support of its position, Buell cites to an analysis of these words by a linguist and to extensive drafting and promulgation history of pollution exclusion clauses. If the phrase "sudden and accidental" is clear and unambiguous, however, the court may not consider such extrinsic evidence in the interpretation of this contract.Heyman Associates, supra, 781. "A court will not torture words to import ambiguity where the ordinary meaning leaves no room for ambiguity, and words do not become ambiguous simply because lawyers or laymen contend for different meanings." (Internal quotation marks omitted) Flint v.CT Page 9631Universal Machine Co., 238 Conn. 637, 646, 679 A.2d 929 (1996), quoting from Schultz v. Hartford Fire Ins. Co., 213 Conn. 696, 703, 569 A.2d 1131
(1990). The court concludes the words "sudden and accidental" in the defendants' insurance policies are clear and unambiguous and are to be accorded their ordinary meaning. The court declines to engage in the linguistic gymnastics required to convert "sudden and accidental" into "unperceived and unintended".
In order for coverage to be afforded to claims arising from pollution, the discharges must have been "sudden and accidental". The court first addresses the meaning of the word "sudden"; it is not necessary to interpret "accidental" if the discharges resulting in the alleged property damage were not "sudden".
Words in an insurance policy should be interpreted in their plain and ordinary sense. Hertz Corp. v. Federal Ins. Co., 245 Conn. 374, 381-382,713 A.2d 820 (1998). Because dictionaries provide the plain and ordinary meaning of words, our courts have frequently referred to such definitions to interpret various words in insurance contracts. Holy Trinity Churchv. Aetna Casualty Surety Co., 214 Conn. 216, 223 n. 5, 571 A.2d 107
(1990); DeWitt v. John Hancock Mutual Life Ins. Co., 5 Conn. App. 590,596, 501 A.2d 768 (1985).
According to Merriam Websters Collegiate Dictionary, Tenth Ed., p. 1998, the word "sudden" has the following meanings: "1 a: happening or coming unexpectedly b: changing angle or character all at once 2: marked by or manifesting abruptness or haste 3: made or brought about in a short time: prompt." Given the forgoing definitions, the court concludes that the word "sudden" has a temporal meaning. Although there are no appellate court decisions addressing this precise issue, various superior court decisions have likewise concluded that the word "sudden" has a temporal meaning under Connecticut law. Reichhold Chemicals, Inc. v. HartfordAccident Indemnity Co., No. X03-CV-88-0085884-S (October 1, 1998) (Connecticut trial courts construe the word "sudden" in a manner consistent with New York construction, holding the term to mean "abrupt"); Linemaster Switch Corp. v. Aetna Life Casualty Corp., No. CV-91-0396432-S (July 31, 1995) (the word "sudden" in the pollution exclusion clause should be given a temporal significance); Carrier Corp.v. The Home Ins. Co., No. CV-88-0352383-S (September 23, 1994) ("sudden" is basically a temporal concept).
Having determined the word "sudden" to have a temporal meaning, the court has reviewed the affidavits and other documentation submitted by Buell in opposition to these motions for summary judgment[2] to determine if any of the events underlying the claims can be characterized as abrupt. The parties generally agree that whatever pollution is present CT Page 9632 at the Highland site was caused by unintentional leakage or other discharge over the approximately six year period between 1966 and 1972. At the Anchor site, the pollution was apparently caused over a longer period of time.
With respect to the Highland site, plaintiff claims at pages 105-106 of its brief that the trichlorethylene ("TCE") in the wastewater lagoon resulted from a degreaser separator malfunction and that such release "may have happened only once. . . The entire amount of TCE that reached the lagoon may well have occurred on a single occasion lasting only a few hours." (Emphasis added.) There are no references, however, to expert reports or any other affidavits or documentation to support this position. As such, it is mere speculation.
With respect to the Anchor site, Buell claims an oil spill in 1971 was an abrupt discharge satisfying the temporal meaning of the word "sudden". At page 109 of its brief; it notes the mishap occurred when a waste oil truck was pumping waste oil from the former waste oil tank (which may or may not have held up to 2000 gallons). The referenced documents to support this statement simply reflect the fact that an incident involving a spill took place sometime in 1971. There is no indication how many gallons were spilled, the period of time during which the spill occurred or any other specific information pertaining to this event. "Although the court must view the inferences to be drawn from the facts in the light most favorable to the party opposing the motion. . . a party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment. (Citation omitted; internal quotation marks omitted.) Norse Systems. Inc. v.Tingley Services. Inc., 49 Conn. App. 582, 591, 715 A.2d 807 (1998). A party opposing a motion for summary judgment must substantiate its adverse claim by showing that there is a genuine issue of material fact together with the evidence disclosing the existence of such an issue." (Citation omitted; internal quotation marks omitted.) Altfeter v. Naugatuck,53 Conn. App. 791, 801, 732 A.2d 207 (1999).
The statements in Buell's briefs, unaccompanied by any documentation to support claimed abrupt discharges of significant amounts of pollutants at either site, are mere speculation and fail to put this matter at issue. They do not rise to the level of establishing the existence of a genuine issue of material fact as to whether there were sudden discharges resulting in the alleged contamination at the Anchor and Highland facilities. Accordingly, defendants' motions for summary judgment are granted as to counts four and nine of the revised complaint.
"AS DAMAGES"
CT Page 9633
Defendants have also moved for summary judgment on the ground that the CGL policies cover "all sums which the insured shall be obligated to pay as damages", and that therefore, even if the pollution exclusion clause does not foreclose liability, plaintiffs remediation expenses are not "damages within the meaning of the policy language. In other words, defendants' claim that even if an occurrence which caused pollution was
sudden and accidental, the remediation expenses incurred by plaintiff are still not covered.
This argument was accepted by Judge Corradino in Linemaster SwitchCorp. v. Aetna, supra, and no other Connecticut authority has been found by the court or provided by counsel. The court finds it unnecessary to address this issue of first impression (at least as far as Connecticut's Appellate Courts are concerned), in view of the fact that summary judgment has already been granted on other grounds.
ALLOCATION
The excess carrier has also moved for summary judgment claiming that a pro rata allocation over the total number of years at issue would prevent the excess policies from ever being reached. This interesting issue of first impression in Connecticut must await another day, for the reasons set forth above.
CONCLUSION
The court finds that plaintiffs claims do not fall within the "personal injury" provisions of the defendants' policies. The court further finds that there is no genuine issue of material fact as to whether certain discharges at the Anchor and Highland sites were "sudden", as that term has been defined by the court as a matter of law. Accordingly, the defendants' motions for summary judgment are granted.