GEORGE PESINO *v.* ATLANTIC
BANK OF NEW YORK
(SC 15743)

Borden, Berdon, Norcott, Katz and McDonald, Js.[1]

---

[1] The panel in this case was originally composed of Justices Borden, Berdon, Norcott, Palmer and McDonald. After oral argument, Justice Palmer recused himself from this appeal. The parties agreed to have this appeal decided by a panel of the four remaining justices. Because the panel was evenly divided, Justice Katz was added to the panel, pursuant to Practice Book § 4111, and she participated in the decision after reviewing the briefs and listening to the tape recording of the oral argument.

The dissent states in footnote 1 of its opinion that counsel for the parties should have been provided with the opportunity to be heard as to the applicability of General Statutes §§ 51-183e, 51-209, and Practice Book § 4111. We disagree because § 4111 governs the procedure in the present case.

Practice Book § 4111 provides: "When the court is evenly divided as to the result, the court shall reconsider the case, with or without oral argument, with an odd number of justices or judges."

The procedure of the appellate court is governed by the rules of appellate procedure, which are promulgated by "[t]he judges of the Supreme Court, the judges of the Appellate Court, and the judges of the Superior Court . . . ." General Statutes § 51-14 (a). "The Superior Court is empowered to adopt and promulgate rules regulating pleading, practice and procedure in judicial proceedings in courts in which they have the constitutional authority to make rules, for the purpose of simplifying proceedings in the courts and of promoting the speedy and efficient determination of litigation upon its merits. . . . Just as the general assembly lacks the power to enact rules governing procedure that is exclusively within the power of the courts; Conn. Const., art. V, § 1; *State* v. *Clemente,* [166 Conn. 501, 510–11, 516, 353 A.2d 723 (1974)]; so do the courts lack the power to promulgate rules governing substantive rights and remedies." (Citation omitted; internal quotation marks omitted.) *State* v. *King,* 187 Conn. 292, 297, 445 A.2d 901 (1982).

The dissent indicates that the procedure followed in the present appeal pursuant to Practice Book § 4111 conflicts with General Statutes §§ 51-209 and 51-183e. Section 51-209 provides: "Majority of judges to concur in decisions. No ruling, judgment or decree of any court may be reversed, affirmed, sustained, modified or in any other manner affected by the Supreme Court or the Appellate Court unless a majority of the judges hearing the cause concur in the decision. No cause reserved, where no verdict has been rendered, judgment given or decree passed, shall be determined unless a majority of the judges hearing the cause concur in the decision. When a case is argued before an even number of judges and court is evenly divided as to the result, a reargument before a full panel shall be ordered."

Although the dissent does not so state, we assume that its argument is based on the requirement of § 51-209 for "reargument" and the provision of § 4111 permitting the court to consider the case, with or without oral argument. Reargument was not required in the present case because § 4111, rather than § 51-209, governs. Whether oral argument is required is a procedural issue within the exclusive province of the courts. "[C]ourts have an inherent power, independent of statutory authorization, to prescribe rules to regulate their proceedings and facilitate the administration of justice as they deem necessary." (Internal quotation marks omitted.) *State* v. *King,* supra, 187 Conn. 297. We construe the statute to leave the decision as to whether additional oral argument is ordered to be within the panel's discre-

Argued September 26, 1997—officially released March 17, 1998

tion. In addition, the discretionary use of oral argument in the situation of an evenly divided panel where a fifth justice is added is consistent with the procedure that this court has followed when a case that was argued before a panel of the court is subsequently considered en banc. Pursuant to Practice Book § 4112, the court may consider a case en banc with or without additional oral argument. We have exercised this discretion by considering a case en banc after oral argument without further argument; see *Iovieno* v. *Commissioner of Correction*, 242 Conn. 689, 689 n.1, 699 A.2d 1003 (1997); *New England Savings Bank* v. *Lopez*, 227 Conn. 270, 270 n.1, 630 A.2d 1010 (1993); *Sassone* v. *Lepore*, 226 Conn. 773, 773 n.1, 629 A.2d 357 (1993); *Property Group, Inc.* v. *Planning & Zoning Commission*, 226 Conn. 684, 684 n.1, 628 A.2d 1277 (1993); *Starr* v. *Commissioner of Environmental Protection*, 226 Conn. 358, 358 n.1, 627 A.2d 1296 (1993); *Kelley Property Development, Inc.* v. *Lebanon*, 226 Conn. 314, 314 n.1, 627 A.2d 909 (1993); *Bunkley* v. *Commissioner of Correction*, 222 Conn. 444, 444 n.1, 610 A.2d 598 (1992); *Maguire* v. *Maguire*, 222 Conn. 32, 32 n.1, 608 A.2d 79 (1992); *State* v. *Mooney*, 218 Conn. 85, 85 n.1, 588 A.2d 145, cert. denied, 502 U.S. 919, 112 S. Ct. 330, 116 L. Ed. 2d 270 (1991); with supplemental briefs; see *State* v. *Sebastian*, 243 Conn. 115, 115 n.1, 701 A.2d 13 (1997); *Blakeslee Arpaia Chapman, Inc.* v. *EI Constructors, Inc.*, 239 Conn. 708, 713 n.10, 687 A.2d 506 (1997); with supplemental briefs and reargument on supplemental questions posed by the court; see *Moore* v. *Ganim*, 233 Conn. 557, 571 n.26, 660 A.2d 742 (1995); and with additional oral argument. See *Haynes* v. *Yale-New Haven Hospital*, 243 Conn. 17, 17 n.1, 699 A.2d 964 (1997); *State* v. *Wilson*, 242 Conn. 605, 605 n.1, 700 A.2d 633 (1997); *State* v. *Webb*, 238 Conn. 389, 389 n.1, 680 A.2d 147 (1996).

*Karl Fleischmann*, with whom, on the brief, were *Carolyn G. Nussbaum*, pro hac vice, and *Richard S. Crummins*, pro hac vice, for the appellant (defendant).

*Gary B. O'Connor*, with whom was *Jayne Elser Welch*, for the appellees (plaintiff class).

*Opinion*

NORCOTT, J. This appeal involves the interpretation of the term "back end payments" as used in a settlement agreement between the plaintiff investor class[2] and the defendant, Atlantic Bank of New York. The defendant

We next turn to § 51-183e, which governs when a casting vote may be utilized, and which provides: "Presiding judge or arbitrator to have casting vote. The Chief Justice, or the presiding judge of a court, when there is an equal division of opinion among *all the judges of the court* including the Chief Justice or presiding judge on any question before it, shall have a casting vote except where it is otherwise specially provided by law. A person presiding in an arbitration or civil proceeding shall in the like case have a casting vote." (Emphasis added.)

Section 51-183e is not implicated in this appeal because the present case was not heard by "all the judges of the court." Rather, this appeal was heard by a full panel of five justices. See General Statutes § 51-207. The casting vote provision is not used to break a two to two tie because such a situation would not involve "all the judges of the court."

[2] The plaintiff, George Pesino, brought and the trial court certified, this case as a class action on behalf of himself and all similarly situated individual investors. Hereafter, we refer to the class members collectively as the plaintiff.

is the successor in interest to the payee of certain promissory notes signed by the plaintiff to finance their investments in Colonial Constitution Limited Partnership (Colonial Constitution). Colonial Constitution was a limited partnership formed in 1989, in which Colonial Realty Company (Colonial Realty) was a general partner.[3] After Colonial Realty collapsed and Colonial Constitution filed for bankruptcy, the plaintiff and the defendant engaged in litigation, each side asserting legal claims to the effect that the other was the proper party to bear the brunt of the enormous financial losses caused by the downfall of Colonial Realty. The parties eventually opted to execute a settlement agreement to apportion the losses. The agreement provided for two methods of payment by the plaintiff to the defendant: (1) each class member was required to make an immediate payment of a portion of the balance of his promissory note; and (2) each class member was to pay to the defendant one half of the amount of any back end payments. These payments were defined in the settlement agreement as "any recoveries, either by settlement or court award, by any Class Member on any claim against any party, other than [the defendant], arising out of or relating to any Colonial [Realty] partnerships." The plaintiff brought this class action against the defendant as a vehicle for the trial court to certify the class, order notice to the class members, and approve the settlement agreement. The trial court granted the joint

---

[3] Colonial Realty, a Connecticut general partnership consisting of Jonathan Googel, Benjamin Sisti and Frank Shuch as general partners, was a national real estate syndication firm consisting of numerous limited partnerships. The limited partnership of Colonial Constitution purchased the property of Constitution Plaza, which consisted of five office buildings, a pedestrian plaza, and two parking garages in downtown Hartford, and offered it in a public syndication. In 1990, involuntary petitions in bankruptcy were filed against Colonial Realty, Googel and Sisti. As a result, several thousand investors sustained substantial losses. Several individuals involved in Colonial Realty were charged with federal crimes in connection with this illegal Ponzi scheme, including Sisti, Googel and Shuch.

motion of the plaintiff and the defendant for a judgment of final settlement approval in April, 1995.

One year later, the United States attorney for the District of Connecticut entered into an agreement (criminal agreement) with Arthur Andersen and Company (Arthur Andersen), an accounting firm under investigation for its involvement with Colonial Realty limited partnerships, and specifically, Colonial Constitution.[4] Under the terms of the criminal agreement, Arthur Andersen agreed to create a settlement fund of $10.3 million to be paid to investors in two Colonial Realty limited partnerships, including members of the plaintiff, in exchange for the United States attorney's agreement not to pursue any potential criminal action against Arthur Andersen.[5] Individual investors are entitled to their share of the settlement fund only upon the satisfactory completion of a claim form.

A dispute subsequently arose between the plaintiff and the defendant as to whether awards received by individual investors from the Arthur Andersen settlement fund should be considered back end payments within the terms of the settlement agreement. Unable to resolve that dispute, the defendant moved for an order to enforce the settlement agreement and for a declaration that moneys received from the settlement fund were back end payments within the meaning of the settlement agreement. The trial court denied the defendant's motion based on its conclusion that the funds were not back end payments. The defendant appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to Practice Book § 4023 and General

[4] Arthur Andersen prepared financial analyses called private placement memorandum in connection with the public offering by Colonial Constitution of Constitution Plaza.

[5] The criminal agreement provided that it was not to be an acknowledgment or admission by Arthur Andersen that it had acted improperly.

Statutes § 51-199 (c). We reverse the judgment of the trial court.

The defendant claims that the trial court improperly engrafted additional terms onto the definition of back end payments contained in the settlement agreement by requiring that such payments be derived directly from the plaintiff's initiative or affirmative act. We agree.

Paragraph 1.5 of the settlement agreement between the parties defines back end payments as "any recoveries, either by settlement or court award, by any Class Member on any claim against any party, other than the [defendant], arising out of or relating to any Colonial partnerships." The trial court construed the term "recovery" to mean any recovery *"brought by or brought about"* by any class member. (Emphasis in original.) Accordingly, the trial court held that the Arthur Andersen funds were not back end payments because "[t]he class members, parties to th[e] agreement, did not bring about, negotiate, or in any way influence the [Arthur] Andersen agreement. That settlement and recovery were not as a result of their efforts or 'by any class member.' " The court reasoned that the class members had "agreed that if they were instrumental in securing addition[al] funds from parties that they might pursue, then those funds, fruit of their efforts, would be shared with [the defendant] in accordance with th[e] agreement."

Our resolution of the defendant's claim is guided by the general principles governing the construction of contracts. *"A contract must be construed to effectuate the intent of the parties, which is 'determined from the language used interpreted in the light of the situation of the parties and the circumstances connected with the transaction. . . . [T]he intent of the parties is to be ascertained by a fair and reasonable construction*

of the written words and . . . the language used must be accorded its common, natural, and ordinary meaning and usage where it can be sensibly applied to the subject matter of the contract. . . . Where the language of the contract is clear and unambiguous, the contract is to be given effect according to its terms. A court will not torture words to import ambiguity where the ordinary meaning leaves no room for ambiguity . . . . Similarly, any ambiguity in a contract must emanate from the language used in the contract rather than from one party's subjective perception of the terms.'" *Lawson* v. *Whitey's Frame Shop*, 241 Conn. 678, 686, 697 A.2d 1137 (1997). "Although ordinarily the question of contract interpretation, being a question of the parties' intent, is a question of fact . . . [w]here there is definitive contract language, the determination of what the parties intended by their contractual commitments is a question of law." (Citations omitted; internal quotation marks omitted.) *Levine* v. *Massey*, 232 Conn. 272, 277, 654 A.2d 737 (1995); see *Mulligan* v. *Rioux*, 229 Conn. 716, 740, 643 A.2d 1226 (1994), on appeal after remand, 38 Conn. App. 546, 662 A.2d 153 (1995); *Bank of Boston Connecticut* v. *Schlesinger*, 220 Conn. 152, 158, 595 A.2d 872 (1991); *Thompson & Peck, Inc.* v. *Harbor Marine Contracting Corp.*, 203 Conn. 123, 131, 523 A.2d 1266 (1987); *Bead Chain Mfg. Co.* v. *Saxton Products, Inc.*, 183 Conn. 266, 274–75, 439 A.2d 314 (1981). In our view, the present case presents such definitive contract language and, therefore, the determination of the parties' intent is a question of law.[6]

---

[6] The plaintiff, however, argues that the trial court's interpretation is a question of fact that is subject to reversal on appeal only if it is clearly erroneous. The plaintiff contends that the trial court was familiar with the agreement because it was the same court that presided over the fairness hearing, approved the class settlement and agreement, and rendered the judgment. Therefore, the plaintiff asserts that when the court was presented with the issue of determining the scope of back end payments, it was able to draw upon its knowledge of the agreement, the parties and the history of the case in determining the intent of the parties. The record, however,

With these principles in mind, we turn to the defendant's claim that the trial court improperly determined that the term "recoveries" as used in the definition of back end payments addresses only those funds that result directly from the plaintiff's efforts. The defendant claims that the language of the settlement agreement explicitly provides that the term back end payments encompasses "any recover[y] . . . by any Class Member" and that, therefore, the term recovery includes the Arthur Andersen funds available to the class members. We agree.

First, our review of the record leads us to conclude that the trial court's interpretation is not supported by the contract language. The settlement agreement provides a clear and unambiguous definition of back end payments. Paragraph 1.5 does not contain any language restricting recoveries to only those initiated by class members. Rather, the definition of back end payments is global and expansive, seeking to encompass *any* recoveries on *any* claims against *any* party arising out of *any* Colonial partnerships. Although the parties may not have envisioned that the class members would be able to avail themselves of funds derived from the efforts of a third party, "a court cannot import into the agreement a different provision nor can the construction of the agreement be changed to vary the express limitations of its terms. *Collins* v. *Sears, Roebuck & Co.*, 164 Conn. 369, 374, 321 A.2d 444 (1973). 'We assume no right to add a new term to a contract, though it were clear that had the attention of the parties been called to it in all probability it would have been inserted.' "

does not lend support to the plaintiff's claim that the trial court's decision was based on factual findings. The decision of the trial court does not reference any of its earlier involvement with the case as a basis for its particular construction of the term "recoveries" in the definition of back end payments. Rather, the trial court rested its decision solely on the language of the agreement. Accordingly, our determination of the meaning of the contractual language is a question of law.

*Hatcho Corp.* v. *Della Pietra*, 195 Conn. 18, 21, 485 A.2d 1285 (1985); see *Bank of Boston Connecticut* v. *Schlesinger*, supra, 220 Conn. 159; *Collins* v. *Sears, Roebuck & Co.*, supra, 374. In determining the meaning of the controverted language in the settlement agreement, our inquiry must focus on the intent of the parties as they expressed it in the agreement. "It is the general rule that a contract is to be interpreted according to the intent expressed in its language and not by an intent the court may believe existed in the minds of the parties." *Levine* v. *Massey*, supra, 232 Conn. 278.

Our analysis therefore is limited to the plain language of the clause. After careful review of the text of the definition, we conclude that the trial court improperly engrafted additional terms into the construction of the term "recoveries." Under the clear language of the settlement agreement as applied to the facts of the present case, we conclude that the term "recoveries" is not limited to funds derived solely by the efforts of the class members, and therefore encompasses the Arthur Andersen funds available to the class members. Our construction is consistent with the purpose of the agreement, which is to provide for the sharing of future revenues with the defendant in exchange for the forgiveness of a significant portion of the plaintiff's promissory notes.

Notwithstanding that the Arthur Andersen funds constitute a recovery, the plaintiff argues that these funds are not back end payments for purposes of the settlement agreement because: (1) they are not a recovery by settlement; and (2) they do not derive from a claim by a class member.

Specifically, the plaintiff asserts that: (1) the termination of the criminal investigation of Arthur Andersen by the United States attorney's office does not constitute a

settlement; and (2) the term settlement refers to civil, not criminal settlements. The plaintiff characterizes the Arthur Andersen funds as a "buy-out of a criminal investigation." Thus, the plaintiff appears to argue that the Arthur Andersen funds are not a settlement because there was no bargained-for exchange. To this end, the plaintiff points to the fact that there was no criminal indictment nor any type of complaint filed against Arthur Andersen. We are unpersuaded.

The Arthur Andersen fund was created as part of the resolution of the investigation conducted by the government into Arthur Andersen's involvement with two Colonial Realty limited partnerships. By its very terms, the criminal agreement between the government and Arthur Andersen provided for an exchange—the cessation of the investigation in return for the creation of a fund for injured investors. Indeed, paragraph seven of the criminal agreement provides that "[t]his agreement is entered, on the conditions set forth herein, for the sole and exclusive purpose of settling and ending the Investigation." We conclude that the funds paid by Arthur Andersen for distribution to particular Colonial Realty investors constitute a settlement within the definition of back end payments.

The plaintiff next claims that the term "settlement" refers to civil rather than criminal settlements. The plaintiff argues that the definition of back end payments contained in paragraph 1.5 of the settlement agreement must be read in conjunction with article eleven, which contains the specific procedure for allocation of these payments between the parties. Paragraph 11.4 does refer to civil actions and provides in relevant part that "to the extent that the [defendant] learns of any civil action brought by Class Members wherein such Class Members are represented by counsel other than counsel signing this Agreement, the [defendant] may supply

notices to counsel for the Class Members, any defendants and any defendants' counsel in such actions concerning the [defendant's] interest in the Back End Payments in order to ensure payment of Back End Payments in accordance with this Agreement." Such a reference, the plaintiff argues, demonstrates that the term settlement was intended to refer only to civil, not criminal, actions. We disagree. There is no textual indication that paragraph 1.5 should be read in conjunction with and be limited by article eleven. Moreover, other language in article eleven itself contravenes the plaintiff's narrow construction. Paragraph 11.4, the same provision upon which the plaintiff relies, provides in pertinent part "that all Class Members shall be obligated to share their interest in the Back End Payments, *however derived,* in accordance with this Agreement." (Emphasis added.) We agree with the defendant that the contract does not specify that the settlement be of a civil dispute.

Finally, the plaintiff argues that the Arthur Andersen funds are not back end payments because they do not derive from a claim by a class member. The trial court agreed, concluding that "[t]he Government['s] [decision] to share its *recovery* with all those 'Colonial' investors who were injured as a result of the involvement of [Arthur] Andersen with the two Colonial partnerships" did not constitute a claim by class members. (Emphasis in original.)

As support, the plaintiff cites the definition of the term "claim" as "[a] cause of action. . . . Demand for money or property as of right . . . . Right to payment . . . ." Black's Law Dictionary (6th Ed. 1990). The plaintiff claims that this definition does not apply to any conduct involved in *its* receipt of payment from the Arthur Andersen fund. As the defendant correctly notes, however, the plaintiff necessarily does make a claim because, in order to obtain any share of the Arthur

Andersen funds, each class member of the plaintiff must complete a claim form documenting his or her investment and entitlement to recovery. We do not agree with the plaintiff's argument that the completion of a fund claim form does not constitute a claim by a class member against any party. The claim form is not merely "an admission ticket" into the fund distribution program, as the plaintiff argues. Rather, it is the exercise of a substantive right to recovery that could affect future litigation. The administrator of the Arthur Andersen fund advised potential claimants that if they "receive a payment from the Settlement Fund that amount may be used as a basis for 'setoff' against any potential future recovery you obtain if you are a participant in those unrelated actions. This means your potential future recovery could be reduced by the amount you receive from the [Arthur Andersen] Fund." A recovery from the Arthur Andersen fund is tantamount to a recovery in a direct action by a class member against Arthur Andersen.[7] Thus, we conclude that a recovery from these funds satisfies the term claim as used in the definition of back end payments.

We conclude that the payments that the plaintiff might receive from the Arthur Andersen fund as a result of submitting a claim form to the fund fall squarely within the definition of back end payments contained in the settlement agreement between the plaintiff and the defendant.

The judgment is reversed and the case is remanded to the trial court with direction to grant the defendant's motion to enforce the order and judgment of final settlement approval.

In this opinion BORDEN and KATZ, Js., concurred.

---

[7] The record is silent on whether Arthur Andersen will seek to offset its damages to the plaintiff in the pending civil litigation by the amount distributed to the plaintiff from the $10.3 million settlement fund.

MCDONALD, J., with whom BERDON, J., joins, dissenting.[1] More than 800 investors who were defrauded in the notorious Colonial Realty Company (Colonial Realty) confidence scheme now are required to pay over $5 million to the defendant, Atlantic Bank of New York.

Central to the Colonial Realty fraud was a deliberate and grossly exaggerated valuation of Colonial Realty properties. Based on those figures, the principals of Colonial Realty, Jonathan Googel, Benjamin Sisti and Frank Shuch, promised the plaintiff investors in Colonial Constitution Limited Partnership, in which Colonial Realty was a general partner, a large return on their partnerships in those properties. They also required those investors to sign millions of dollars in notes that were endorsed over to the defendant, which provided financing for Colonial Realty properties. The defendant then gave Colonial Realty loans far exceeding the real value of its properties. Arthur Andersen and Company (Arthur Andersen), an accounting firm, furnished audits supporting Colonial Realty's extravagant claims. When Colonial Realty collapsed, Googel and Sisti were arrested and prosecuted for federal crimes and Shuch committed suicide after his arrest. The United State's attorney for the District of Connecticut also began a criminal investigation of Arthur Andersen.

The plaintiff investors, facing the prospect of the defendant seeking to recover on the outstanding notes, brought suit in 1991 against the defendant, alleging that the defendant knowingly participated in the fraud.

---

[1] This case was before a panel of five justices of this court, one of whom disqualified himself during oral argument. The parties then entered into a written agreement that the case be decided by the four remaining justices. While the case was under consideration, a fifth justice was added but reargument before the full panel, as required by General Statutes § 51-209, did not occur. We should, I believe, have provided counsel, in these circumstances, with an opportunity to be heard as to the applicability of General Statutes §§ 51-183 (e) and 51-209, and Practice Book § 4111, the provisions of which conflict.

Faced with these allegations, the defendant in 1994 entered into a settlement agreement with the plaintiff investors. In the settlement agreement, the plaintiff investors agreed to pay the defendant reduced "front-end payment[s]," that is, cash payments, as well as one half of any "back end payments" they should receive in the future. "Back end payments" were defined in the settlement agreement as "any recoveries, either by settlement or court award, by any Class Member on any claim against any party . . . arising out of or relating to any Colonial partnerships."

In 1996, the United States attorney and Arthur Andersen entered into an agreement (criminal agreement) whereby Arthur Andersen established a restitution fund of $10 million for the benefit of the innocent investors, including the plaintiffs. In exchange, the United States government deferred and later closed its criminal investigation and Arthur Andersen was not prosecuted.

The sole issue before us now is whether $5 million of the $10 million restitution fund created by Arthur Andersen constituted a "back end payment" within the meaning of the settlement agreement. I agree with the majority that "[a] contract must be construed to effectuate the intent of the parties, which is 'determined from the language used interpreted in the light of the situation of the parties and the circumstances connected with the transaction.' " *Lawson* v. *Whitey's Frame Shop*, 241 Conn. 678, 686, 697 A.2d 1137 (1997).

The restitution by Arthur Andersen is not a "recovery" within the meaning of the settlement agreement. The usual meaning of recovery is the "restoration or vindication of a right existing in a person, by the formal judgment or decree of a competent court, at his instance and suit." Black's Law Dictionary (6th Ed. 1990). The amount to be received from Arthur Andersen does not result from an action brought by the plaintiff investors.

The plaintiff investors agreed to share with Atlantic only those recoveries they receive by "settlement or court award." The Arthur Andersen restitution fund clearly is not a court award. If it is to be a "back end payment," it must come within the definition of a recovery by a "settlement." The Arthur Andersen criminal agreement does not constitute a settlement within the plain meaning of that word. A settlement is "an adjustment between persons concerning their dealings . . . ." Black's Law Dictionary (6th Ed. 1990). Surely, the parties could not have intended a settlement arrived at by a benevolent third party, especially one that could hardly have been envisioned in 1994.[2] The criminal agreement between the United States government and Arthur Andersen did not constitute a settlement by any of the plaintiff investors. They were not parties entering into the agreement between the United States government and Arthur Andersen.

Furthermore, the purpose of the $10 million restitution fund reveals that it was not a settlement with respect to the plaintiff investors. The criminal agreement was between the United States government and Arthur Andersen and concerned only the criminal prosecution of Arthur Andersen. Prosecution could have resulted only in Arthur Andersen's punishment with a criminal fine and not in any award to the plaintiff investors or an adjustment of their claims. Nor was the government forced to require the establishment of a restitution fund for certain of Colonial Realty's investors, the innocent victims of Colonial Realty's crimes. The government gratuitosly chose to require the large restitution fund to warn business professionals engaged

---

[2] The majority concludes that because the criminal agreement states that it was "entered . . . for the sole and exclusive purpose of settling and ending the Investigation" by the United States government of Arthur Andersen, it then becomes a settlement by the plaintiff investors. There is nothing in the wording of the criminal agreement nor in logic to support this conclusion.

in wrongdoing of the risk of criminal prosecution.[3] Neither the criminal agreement nor the restitution payment procedure was a settlement.[4]

Nothing arising from the United States government's charity toward the innocent plaintiff investors, many of whom lost their life savings and faced financial ruin, requires that one half of this restitution fund be paid to the defendant. The defendant entered into the settlement agreement with the plaintiff investors due to allegations that it had participated in the Colonial Realty fraud. The United States government chose not to make the defendant an innocent victim to share in the restitution fund, but nonetheless, the defendant now becomes, by this decision, the largest single beneficiary of Arthur Andersen's payment to the plaintiff investors. Justice here goes awry to the tune of five million dollars.

I respectfully dissent.

---

[3] See "Review of Developments in State Securities Regulation," 51 Bus. Law. 223, 269 (1995), describing a similar arrangement in a massive stock fraud case regarding Prudential Securities, Inc., a large brokerage house.

[4] Arthur Andersen reserved the right to argue for a credit for its restitution. The plaintiffs, however, did not agree to such a credit, and it is far from certain it will be allowed.