[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION 
By application dated March 6, 2000, the plaintiff, United Illuminating Company (UI), seeks an order vacating a certain arbitration award involving a dispute over the meaning of specific contractual provisions in written agreements between the plaintiff and the defendant, Wisvest-Connecticut, LLC (Wisvest). The defendant filed a counterclaim requesting the court to enter an order confirming the award.
The agreements at issue consist of a Power Supply Agreement (PSA) (Exhibit A) and two letter agreements (Exhibits B and C), all of which were executed on April 16, 1999. These agreements were integral to a certain transaction between the parties involving the sale by UI to Wisvest of certain of its power generation assets, including the Bridgeport Harbor Station and the New Haven Harbor Station. Notwithstanding the sale of these power generation assets to Wisvest, UI remained obligated to supply energy to retail customers in its retail service territory (its retail load) until June 30, 2000. UI retained some of its generation assets (retained assets), but the retained assets were not expected to deliver sufficient energy to meet its entire retail load obligations.
For this reason the parties executed the PSA, in which Wisvest agreed to supply the electric service required by UI to meet its retail load obligations in excess of the amount supplied by UI's retained assets. The agreed upon price to be paid to Wisvest for this energy was $42.00 per megawatt hour in 1999 and $34.00 per megawatt hour in 2000. The $42.00 CT Page 14991 price, being higher than the expected average energy clearing price for 1999, was favorable to Wisvest.
In late 1998, prior to the execution of the PSA, a dispute arose between the parties as to whether or not energy from Hydro-Quebec (HQ) should be considered a retained asset. The PSA's definition of retained assets clearly included the "purchased power agreement . . . with Hydro-Quebec", but Wisvest understood UI's interest in the contract with HQ to be purely a financial arrangement. Changes to the operating rules of New England Power Pool (NEPOOL) were to take effect after May 1, 1999, resulting in actual deliveries of HQ energy to UI. This would result in a decrease of the amount of energy UI would have to purchase from Wisvest to meet the obligations of its retail load. Wisvest claimed UI should not be able to treat any of HQ's energy as a retained asset; UI claimed it was entitled to treat 100% of the energy delivered pursuant to the HQ contract as a retained asset.
To resolve this dispute, the parties engaged in extensive negotiations, culminating in two letter agreements addressing the utilization of the contested energy and implementation procedures. The clauses at issue provide, in relevant part, as follows:
 From the date of the closing . . ., UI will have the right to utilize up to the [cap amounts] of the energy scheduled for delivery by HQ to serve UI's own retail load, and UI will sell into the market all energy scheduled for delivery by HQ in excess of that amount.
Exhibit B, p. 1-2.
 Implementation on and after the Second Effective Date [May 1, 1999] Under New Market Rules
 Wisvest and UI agree as follows solely for the purpose of implementing their Power Supply Agreement on and after the Second Effective Date in accordance with the new NEPOOL market rules:
 For each hour, the UI load in the power system model will be split into
 (A) the UI Supplied Load (the applicable Seasonal Claimed Capability of Seabrook, MP # 3 and RESCO plus the energy supplied by Shelton Landfill, Derby Hydroelectric and HQ, provided that, with respect to CT Page 14992 HQ, UI will be entitled to supply its energy requirements with up to the Mwh/hour that HQ is scheduled to deliver in any hour until such energy . . . equals [the cap amounts]; and
 (B) the Wisvest Supplied Load that Wisvest will be supplying to UI at wholesale under the Power Supply Agreement.
Exhibit C, p. 3-4.
It is undisputed that the letter agreements memorialized the parties' settlement of the disputed issues involving HQ energy. The PSA and the letter agreements were signed at the closing on April 16, 1999.
In the summer of 1999, the price of power increased dramatically. The $42.00 Wisvest price was now much lower than the price of HQ energy. UI applied less than the amount of HQ energy scheduled and delivered in a given hour to its retail load and sold the balance of the HQ energy delivered in that hour to the wholesale market. The concomitant effect was to increase the amount of energy Wisvest was required to supply to UI. Wisvest claimed UI's actions constituted a breach of the PSA and letter agreements, and demanded arbitration pursuant to Article 15 of the PSA.
The arbitration panel heard evidence over the course of five days in October and November of 1999. At issue in the arbitration was the meaning of the contractual provisions in the letter agreements addressing UI's utilization of HQ energy, specifically the above-quoted language in Exhibits B and C. The panel, in a 2-1 decision issued February 11, 2000, concluded that the operative language in the letter agreements was ambiguous. Considering extensive evidence submitted to determine the intent of the parties, the panel concluded that the agreements required UI to allocate the cap amount of HQ's energy to its retail load obligations before purchasing energy from Wisvest and selling HQ energy to the wholesale market. Given this conclusion, the panel majority found UI breached its contract with Wisvest and awarded damages in the amount of $1,359,476, plus interest computed in accordance with Article 7 of the PSA.
As a starting point, the court must determine the proper standard of review. Typically, arbitration is a creature of contract. The language of the contract controls both what disputes will be arbitrated and what issues are arbitrable. Emcon Corp. v. Pegnataro, 212 Conn. 587, 592,562 A.2d 521 (1989); Gary Excavating, Inc. v. North Haven, 164 Conn. 119,122, 318 A.2d 84 (1972 ). "The authority of an arbitrator to adjudicate CT Page 14993 the controversy is limited only if the agreement contains express language restricting the breadth of issues, reserving explicit rights, or conditioning the award on court review. In the absence of any such qualifications, an agreement is unrestricted." Garrity v. McCaskey,223 Conn. 1, 5, 612 A.2d 742 (1992); see also Carroll v. Aetna Casualty Surety Co., 189 Conn. 16, 20, 453 A.2d 1158 (1983).
In the present case, Article 15 of the PSA sets forth the procedures for the resolution of disputes. Section 15.2 provides, in relevant part, as follows:
 If . . . the Parties are unable to resolve any dispute, disagreement or difference pertaining to or arising out of this Agreement, . . . such disagreement shall be settled by arbitration and any award issued pursuant to such arbitration may be enforced in any court of competent jurisdiction. . . .The arbitrators shall be bound by the provisions of this Agreement, where applicable, and shall have no power to amend, modify or add to this Agreement in any manner. All factual determinations made by the arbitrators shall be conclusive and binding on the Parties and not subject to judicial review. Any conclusions of law made by the arbitrators shall be subject to review in any court of competent jurisdiction within the State of Connecticut. . . .
The submission of the parties, therefore, is restricted to the extent that any conclusions of law flare reviewable by this court. The plaintiff and the defendant agreed, at the time of argument on this application to vacate the award, that the issue of whether a contract is ambiguous or unambiguous is a question of law.
If a contract is clear and unambiguous, the parties' intent is a question of law and is determined by the contract language itself without reference to extrinsic evidence. Tallmadge Bros., Inc. v. Iroquois GasTransmission System, L.P., 252 Conn. 479, 494-495, 746 A.2d 1277 (2000);Heyman Associates No. 1 v. Insurance Co. of Pennsylvania, 231 Conn. 756,776, 653 A.2d 122 (1995). Being solely a question of law, the issue would be entitled to de novo review by this court. If a contract is ambiguous, the intent of the parties is a question of fact. Id. Under the provisions of the PSA, factual issues are not subject to judicial review.
It is undisputed that the letter agreements dated April 15, 1999, which were signed at the same time the PSA was signed on April 16, 1999, served to settle the dispute between the parties concerning the treatment of the CT Page 14994 energy delivered by HQ. As such, they did not entirely replace the PSA; they did, however, change or supplement the PSA's provisions pertaining to HQ. exhibit B specifically states that "[t]his Letter of Understanding memorializes an agreement between . . . Wisvest . . . and . . . UI for the purpose of resolving an issue as to the meaning of Retained Assets in the [PSA] regarding . . . HQ. . . ."
The critical issue in this matter is whether the contractual language in Exhibit B concerning the utilization of HQ energy is ambiguous or unambiguous. The clause provides that UI has "the right to utilize up to the [cap amounts] of the energy scheduled for delivery by HQ to serve UI's own retail load, and UI will sell into the market all energy scheduled for delivery by HQ in excess of that amount." UI maintains such language is clear and allows UI to sell HQ energy into the market, before allocating such energy to its retail load and prior to reaching the cap amounts. Wisvest maintains that the language is ambiguous, when read in context with the PSA, and must be interpreted to require UI to apply all scheduled and delivered HQ energy to UI's retail customer load requirements until the agreed cap amount has been reached.
The court concludes that de novo review is the proper standard because of the definitive contract language in the subject provisions of Exhibits B and C.
"Although ordinarily the question of contract interpretation, being a question of the parties' intent, is a question of fact . . . [w]here there is definitive contract language, the determination of what the parties intended by their contractual commitments is a question of law. . . ." Tallmadge, supra, 495, quoting from Levine v. Massey, 232 Conn. 272,277, 654 A.2d 737 (1995). "Where there is no ambiguity [in the language of a contract] . . . there is no occasion for construction [to determine intent] and the agreement will be enforced as its terms direct." McHughv. McHugh, 181 Conn. 482, 491, 436 A.2d 8 (1980); Paul Revere Life Ins.Co. v. Pastena, 52 Conn. App. 318, 322, 725 A.2d 996 (1999). "Contract language is unambiguous when it has a "definite and precise meaning . . . concerning which there is no reasonable basis for a difference of opinion. . . ."(Citations omitted.)" Levine v. Advest, Inc., 244 Conn. 732,746, 714 A.2d 649 (1998). Unambiguous contract provisions are to be given their plain meaning without reference to extrinsic evidence. HeymanAssociates, supra, 781.
"[In interpreting contract provisions], . . . the intent of the parties is to be ascertained by a fair and reasonable construction of the written words and . . . the language used must be accorded its common, natural, and ordinary meaning and usage where it can be sensibly applied to the subject matter of the contract. . . .A court will not torture words to CT Page 14995 import ambiguity where the ordinary meaning leaves no room for ambiguity. . . .Similarly, any ambiguity in a contract must emanate from the language used in the contract rather than from one party's subjective perception of the terms. . . ." (Citations omitted; internal quotation marks omitted.) Pesino v. Atlantic Bank of New York, 244 Conn. 85, 91-92709 A.2d 540 (1998). "In interpreting a contract courts cannot add new or different terms." Cirrito v. Turner Construction Co., 189 Conn. 701,706-707, 458 A.2d 678 (1983).
The subject clause provides that UI has the "right" to utilize "up to" the cap amounts of HQ energy to serve its retail load. These are the words the parties chose to express their agreement. Most importantly, the letter agreement does not state that UI must allocate the cap amounts, if available, to its retail load prior to selling it into the market. The plain and ordinary meaning of the word "right", defined at page 1008 of the tenth edition of Merriam Websters Collegiate Dictionary, is "2: something to which one has a just claim: as . . . the power or privilege to which one is justly entitled". The court will not torture the meaning of the word "right" to impose an "obligation" upon UI to apply the cap amounts of HQ energy to its retail load. Moreover, it is a right to utilize "up to" the cap amounts, not a requirement to utilize the entire cap amount if available. Certainly the parties, both sophisticated commercial entities, could have written the agreements in such a fashion as to require the utilization of such energy to serve UI's retail load prior to the sale of any such energy into the market. They simply did not do so and the court will not read such a meaning into the contract as written.
This clause does not become ambiguous when read in context with other provisions in Exhibit B, the PSA or Appendix A to the PSA. Although the PSA made no provision for any cap amounts or differential treatment of HQ energy, the purpose of the letter agreements in adding these provisions was to resolve a dispute concerning the utilization of HQ energy. The letter agreements were modifications of the PSA; the parties agreed that the treatment of HQ would be governed in accordance with the changes as set forth in the letter agreements. Wisvest cannot legitimately claim ambiguity between Appendix A of the PSA and the letter agreements when the parties singled out HQ energy for differential treatment subsequent to the drafting of Appendix A.
Exhibit C, the letter agreement addressing the implementation procedures correspondingly provides that "with respect to HQ, UI will be entitled to supply its energy requirements with up to the Mwh/hour that HQ is scheduled to deliver in any hour until such energy . . . equals [the cap amounts]. . . ." Exhibit C simply reaffirms that HQ energy is treated differently from the energy obtained from other facilities and is CT Page 14996 consistent with the provisions of Exhibit B.
One of the reasons Wisvest claims the clauses pertaining to HQ energy are ambiguous is because the price of energy after May 1, 1999 increased to amounts that neither Wisvest nor UI had anticipated. Instead of Wisvest energy costing more than energy provided by UI's retained assets and HQ, the opposite occurred. The language in the letter agreements allowed UI to take advantage of the situation and purchase energy at a low cost and sell energy from HQ at a high cost. Wisvest argues that such a result is unfair.
The fact remains, however, that the language in the letter agreements expressly permits such a result. The parties do not claim fraud or mutual mistake. The arbitration panel, at page 13 of its decision, specifically stated that no evidence was presented to indicate any grounds existed, e.g., mistake, fraud or unconscionability, to warrant either voiding or reforming the PSA. Thus, the court is left with the language chosen by the parties to express their agreement.
This case, in some respects, is similar to the case of Pesino v.Atlantic Bank of New York, 244 Conn. 85, 709 A.2d 540 (1998). In Pesino, the plaintiff likewise argued that a strict reading of certain language in a settlement agreement between the parties would not effectuate the intent of the parties because certain subsequent events had not been anticipated by the parties and factored into the agreement. The dispute centered over the definition of back end payments. The Court noted:
 The settlement agreement provides a clear and unambiguous definition of back end payments. . . .[T]he definition of back end payments is global and expansive, seeking to encompass any recoveries on any
claims against any party arising out of any Colonial partnerships. Although the parties may not have envisioned that the class members would be able to avail themselves of funds derived from the efforts of a third party, "a court cannot import into the agreement a different provision nor can the construction of the agreement be changed to vary the express limitations of its terms. Collins v. Sears, Roebuck Co., 164 Conn. 369, 374, 321 A.2d 444
(1973). "We assume no right to add a new term to a contract, though it were clear that had the attention of the parties been called to it in all probability it would have been inserted."' (Citations omitted; emphasis in original.) CT Page 14997
Id., 93-94.
The court finds the case of Tallmadge Bros., Inc. v. Iroquois GasTransmission System, L.P., 252 Conn. 479, 746 A.2d 1277 (2000) to be dispositive of this matter. In Tallmadge, the parties entered into a settlement agreement whereby the defendant would pay a certain fixed amount as compensation for a complete release from any and all liability incident to the construction of a pipeline across the plaintiffs' shellfish grounds. After the execution of the agreement, the plaintiffs filed a complaint asserting that the size of the work area was larger than the parties had originally contemplated and that the loss of shellfish was substantially higher than anticipated. The trial court concluded the defendant breached the settlement contract and awarded the plaintiffs damages.
The Connecticut Supreme Court found the contract language to be definitive and undertook a de novo review of the trial court's determination. After noting the disputed agreement was a commercial contract between sophisticated commercial parties with relatively equal bargaining power, the Court found the contractual language "sufficiently definitive to obviate any need for deference to the trial court's factual findings as to the parties' intent." Id., 497. Concluding that the parties intended to create a fully integrated contract, the Court found the trial court's consideration of extrinsic evidence to be improper. Id., 505. Although it appeared that the plaintiffs were not aware of the increase in the width of the work area when they signed the settlement contract, the Court would not look beyond the words used in the written agreement and ascertained the parties' intent by a fair and reasonable construction of those written words. "Especially in the context of commercial contracts, we assume that definite contract language is the best indication of the result anticipated by the parties in their contractual arrangements." Id., 500.
The Court in Tallmadge reversed the decision of the trial court and directed judgment for the defendant. Even though the plaintiffs, as Wisvest in this case, claimed the result was unfair, the Court gave the following rationale for its decision:
 In sum, we view this case as an opportunity to reaffirm the wisdom of our earlier admonition that "[c]ourts do not unmake bargains unwisely made. Absent other infirmities, bargains moved on calculated considerations, and whether provident or improvident, are entitled nevertheless to sanctions of the law. . . .Although parties might prefer to have the court decide the plain effect of their contract contrary to CT Page 14998 the agreement, it is not within its power to make a new and different agreement; contracts voluntarily and fairly made should be held valid and enforced in the courts." (Citation omitted; emphasis added.) Robert Lawrence Associates, Inc. v. Del Vecchio, 178 Conn. 1, 21-22, 420 A.2d 1142 (1979). The parties in this case entered into sophisticated and carefully crafted commercial contracts from positions of relative equality, without the improper influence of fraud or duress. Even if the result of the fair and logical enforcement of those unambiguous agreements seems unduly to burden one of the parties, we decline to embark a voyage into uncharted waters in which untrammeled and unrestrained judicial revisionism would depart significantly from an aspect of contract law upon which contracting parties reasonably can be assumed to have relied for many years.
Id., 505-506.
For the foregoing reasons, the court finds that the contractual language in the letter agreements is clear and unambiguous. UI, by the terms of the settlement provisions, had the eight to use up to the cap amounts of HQ energy to serve its retail load. It was not obligated to utilize the entire cap amount prior to selling such energy into the market. The arbitration panel's finding that the contractual language was ambiguous, permitting the consideration of extrinsic evidence to determine the parties' intent, and its conclusions that the agreements required UI to allocate the cap amounts of HQ's energy to its retail load obligations before purchasing energy from Wisvest and selling HQ energy to the wholesale market, were erroneous as a matter of law.
The plaintiff's application to vacate the arbitration award is granted. The defendant's request for an order confirming the award, as set forth in its counterclaim, is denied.
Judgment will enter accordingly.
Koletsky, J.