[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The plaintiff is a contract purchaser of Unit No. 248 in the condominium known as Breakwater Key in Stratford, Connecticut. The CT Page 9432 defendant, Coast Venture XXVX, Inc., was the owner/developer of that project when it and the plaintiff entered into a written contract for the construction and sale of Unit 248. The defendant was a Nevada corporation made up of Nevada investors which acquired the property from Long Island Sound Development which had earlier acquired title from Breakwater Key, Inc., in 1991. The original developer of the project was Nicholas Owens who began selling units in 1988, who was the sole stockholder in Breakwater Key, Inc., and who, during all relevant times associated with this case, was acting as the property manager for the defendant corporation. Although Owens reported to the corporation, he was for all practical purposes the party in charge of the daily supervision of all aspects of the property as he had been from its inception. He clearly operated as the agent for the defendant.
The negotiations between the parties began with an offer to purchase Unit 248 dated June 12, 1995, for the sum of $165,000. That was followed up by a formal contract signed by the parties on July 18, 1995, wherein the defendant agreed to sell to the plaintiff Unit 248 for the sum of $165,000. The contract was signed on behalf of the defendant by Attorney Leonard Paoletta, its attorney in fact. The original closing date was set for December 31, 1995. Section 12B of that agreement, which is quoted below, is the most significant section for purposes of the resolution of this controversy.
 B. SELLER. If the SELLER for any reason whatsoever, including construction delays, shall fail, or be unable to convey title or perform its obligations hereunder, the sole and exclusive liability of that SELLER shall have as a result of such default shall be to refund to PURCHASER all monies paid hereunder together with liquidated damages in the amount of $1,000 and the recovery of such monies and liquidated damage amount shall be the sole and exclusive remedy of the PURCHASER for such default. PURCHASER hereby covenants and agrees that he will not commence any legal and/or equitable action in the event of such a default by SELLER beyond that to seek the recovery of such monies and liquidated damage amount. The provisions of Paragraph 7B shall govern in the event of the inability of SELLER to perform because of a title defect.
This case was previously tried before an Attorney Trial Referee who made a decision which was objected to and eventually rejected by a judge of the Superior Court. When the matter was set for trial before this court, the parties stipulated that the transcript of the testimony of all witnesses and all exhibits before the Attorney Trial Referee would CT Page 9433 constitute the evidence for a disposition by this court. This court has reviewed the transcript and all the exhibits.
Subsequent to the signing of the contract, the plaintiff successfully obtained a mortgage commitment and paid a commitment fee of $1,485. By letter dated November 21, 1995, Attorney Paoletta wrote to plaintiff's attorney requesting an extended closing date of January 31, 1996, which plaintiff's counsel agreed to on condition that his out-of-pocket expenses were covered. There was no response to that condition. The unit was not ready on January 31, 1996, and no closing took place. On April 18, 1996, by letter, Nicholas Owens, on behalf of the defendant, wrote the plaintiff that the condominium would not be ready until June 28, 1996. This delay caused the plaintiff to lose its mortgage commitment, and he successfully got another one at an additional commitment fee of $1,485.
No closing took place on June 28, 1996. By letter dated July 21, 1996, Nicholas Owens advised the plaintiff that the closing would not take place until September 30, 1996, and agreed the defendant would absorb any additional mortgage commitment fees. No closing took place on that day and in a letter to the plaintiff dated October 28, 1996, Owens, on behalf of the defendant, indicated that the Seller "will not be able to convey title to you" and stated further that seller "hereby terminates your contract" pursuant to paragraph 12B of said contract with a willingness to refund all deposits along with liquidated damages in the amount of $1,000. Owens indicated the money could be picked up at his office any time after November 1, 1996. Thereafter, on December 3, 1996, by letter to plaintiff's attorney, Owens stated he had returned the deposit check to Attorney Paoletta and it could be picked up at his office. It is absolutely clear that on the exercise of the defendant's supposed right to terminate the contract pursuant to section 12B of the contract, neither Owens, Paoletta or anyone else on behalf of the defendant used the simple expedient of returning to the plaintiff nor his attorney the deposit of $16,500 and the $1,000 liquidated damages.
By letters dated December 12, 1996, January 15, 1997, and January 27, 1997, plaintiff's attorney wrote Attorney Paoletta inquiring about the deposit monies and was eventually notified by Paoletta he did not have the same and had never received it from Mr. Owens.
This case was commenced on February 2, 1997. The parties appeared in court on May 12, 1997, on a hearing for a prejudgment remedy at which time the parties stipulated to a settlement of the case with the defendant paying the sum of $19,500 to the plaintiff's attorney, Kurt Ahlberg, by May 16, 1997. If that payment was not made, a prejudgment attachment in that amount would be issued. Mr. Owens agreed to that settlement on behalf of the defendant. That agreed upon amount was not CT Page 9434 paid to Attorney Ahlberg by May 16.
There was conflicting testimony as to the return of the deposit money and liquidated damages. What is clear is that it was never paid to the plaintiff or his attorney. What is also clear is that the plaintiff always wanted to purchase the unit and would have preferred that to a return of his money.
It is also clear that there was a falling out between Mr. Detar and Mr. Owens. Mr. Owens made it clear he did not want Detar on the premises during the construction phase and he made that clear to Detar and his attorney.
Apparently there was one conversation on the premises between Owens and Detar in the presence of Jeri Pond, plaintiff's witness, some time in September or October of 1996 but before Mr. Owens' letter of October 28, 1996, terminating the contract, wherein Owens ordered Detar off the premises and told him he would never own the unit, he would never get his money back and that Owens would see to that.
During his testimony at the hearing before the Attorney Trial Referee, Mr. Owens gave a long rambling answer to the question as to why Coast Venture chose to terminate its contract with the plaintiff. (See transcript pages 35-40 of the hearing on November 18, 1999.) His attorney at the hearing finally asked:
 "Mr. Owens, without giving a speech, isn't it true that the reason Coast Venture or the precipitating reason why Coast Venture terminated the contract with Mr. Detar was its concerns over Mr. Detar's effect on the project as a whole?"
Mr. Owens replied "Yes."
Thus it is clear that the defendant terminated the contract not because of any default of its own or an inability to convey to Mr. Detar, but because it simply did not want to convey to him because of his effect on the project. The defendant's brief makes the claim that Coast Venture did in fact convey Unit 248 to a third party some time in February of 1998, but no direct evidence was offered on that subject. . . .
So the issue squarely before the court is, "Did Section 12(B) of the contract give the defendant the right to terminate the contract for the reason given or if it did not and the court finds the defendant in breach of contract, what is the plaintiff's current remedy? The court, then, must interpret the meaning of Section 12(B) of the contract. As was CT Page 9435 stated in Ciarleglio v. Benedict Co., Inc., 127 Conn. 291 at page 293, (1940), "The defendant drew the contract. It is the Seller's own language which is to be interpreted, and if the instrument is so drawn as to leave room for two constructions, the words used should be interpreted most strongly against it." That is exactly what we have here.
In the case of Pesino v. Atlantic Bank of New York, 244 Conn. 85, 91-92
(1998), the Supreme Court of the State of Connecticut summarized the general principles governing the interpretation of contracts as follows:
 "A contract must be construed to effectuate the intent of the parties, which is `determined from the language used interpreted in the light of the situation of the parties and the circumstances connected with the transaction. . . . The intent of the parties is to be ascertained by a fair and reasonable construction of the written words and . . . the language used must be accorded its common, natural, and ordinary meaning and usage where it can be sensibly applied to the subject matter of the contract. . . . Where the language of the contract is clear and unambiguous, the contract is to be given effect according to its terms. A court will not torture words to import ambiguity where the ordinary meaning leaves no room for ambiguity. . . . Similarly, any ambiguity in a contract must emanate from the language used in the contract rather than from one party's subjective perception of the terms.'" Lawson v. Whitey's Frame Shop, 241 Conn. 678, 686, 697 A.2d 1137
(1997). "Although ordinarily the question of contract interpretation, being a question of the parties' intent, is a question of fact . . . where there is definitive contract language, the determination of what the parties intended by their contractual commitments is a question of law."
The defendant argues that section 12(b) gives it the right to terminate the contract for any reason whatsoever, presumably even the color of the purchaser's eyes. That is an unreasonable interpretation and would give the defendant seller the right to terminate any contract to purchase that it wanted to. The effect would be to render any contract unenforceable by the contract purchaser.
Let us look at the language carefully. It is obviously a default clause. Its pertinent language is, "If the seller for any reason whatsoever, including construction delays, shall fail, or be unable to convey title or perform its obligation hereunder, the sole and exclusive CT Page 9436 liability of that Seller shall have as a result of such default shall be. . . ." The court concludes that the only reasonable construction of that language is that if the seller was unable to perform the contract, it provided liquidated damages to the purchaser and saved itself from any law suit. The clause simply cannot be interpreted to give the defendant the right to terminate the contract if it was unwilling to perform it, which this court concludes was the only reason for this termination.
With that construction in mind, let us examine the facts here. Obviously, there were several delays in the construction of this unit and several closing dates passed. Despite that, the plaintiff never complained or sought to terminate the contract. He always wanted the unit and was always ready, willing and able to purchase it. There is no evidence that the defendant was unable to convey title to the plaintiff. Even after the parties essentially settled the case in court in May of 1997, Mr. Owens claims he did not pay the settlement amount because the plaintiff still wanted to purchase the unit.
The court finds that under the circumstances of this case that section 12B is inapplicable and gave the defendant no right to terminate the contract. It is obvious that Mr. Owens and Mr. Detar had a falling out prior to Mr. Owens' letter of October 28, 1996, terminating the contract. There is ample evidence that some time just before that letter that Owens told Detar in front of a witness that Detar would never own the unit, never get his money back, and Owens would see to that. In his testimony here, Owens gave a long and rambling explanation as to why he would not convey to Detar which concluded with the defendant's attorney asking: "Mr. Owens, without giving a speech, isn't it true that the reasons Coast Venture or the precipitating reason why Coast Venture terminated the contract with Mr. Detar was its concerns over Mr. Detar's effect on the project as a whole?" and Mr. Owens answer, "Yes."
Section 12(B) gave the defendant the right to terminate a contract that it was unable to perform but no right to terminate a contract which it chose not to perform for personal reasons. The court finds that the defendant has breached its contract with the plaintiff. Before considering the claim for damages, the court will briefly discuss the second count of the complaint claiming a violation of the Connecticut Unfair Trade Practices Act (CUTPA) arising out of the defendant's conduct in this case.
The court will not spend much time with this issue because it finds no factual predicate to support it. Although evidence was presented that the defendant or more probably its predecessors had been sued by contract purchasers, the time frame of those suits and the specific claims by them remained unclear. Even if Mr. Owens in his various capacities with CT Page 9437 earlier entities that he owned and controlled committed acts that might approach unfair trade practices, they cannot be transferred to this corporate defendant. Further, there is no question that there was a falling out between Mr. Detar and Mr. Owens, and Mr. Owens spelled out his reasons for that breakdown in his testimony. There is no way this court can test whether or not any of those claims have any validity. To the extent any of them had validity, they could at least offer a defense to a CUTPA claim. Further, the contract could have been construed by Owens to give him the right to terminate this contract. Although this court has construed it differently, it is at least possible that either Owens, alone or on the advice of counsel, thought he could do what he did. The fact that he erroneously terminated this contract on behalf of the defendant under section 12B does not rise to the level of a CUTPA violation and judgment may enter for the defendant on that count.
The plaintiff in his brief continues to ask for specific performance of the contract. The court will not grant specific performance. The plaintiff had agreed to settle this case in May of 1997 for the payment of $19,500 money damages. The court concludes that the proper remedy here is money damages.
Certain elements of the damage claim are obvious. The plaintiff is obviously entitled to the return of his deposit in the amount of $16,500. He is also entitled to the return of the two mortgage commitment fees each in the amount of $1,485. The plaintiff also seeks to recover $22,500 which he claims he lost on the sale of his prior residence, unit 117, 1110 New Haven Avenue in Milford. As a part of his mortgage commitment from Webster Bank, he had to sell unit 117, pay off the mortgage on it and show cash generated on the sale of $20,000 before Webster would advance mortgage funds. He testified that he had to sell the unit before September 30, 1996, and in fact did convey it on August 29, 1996, in order to close on unit 248 by that date. He claims he had to sell the property for $42,500 in a forced sale when, in his opinion, unit 117 had a fair market value of $65,000. His testimony was the only evidence concerning property values during the hearing before the attorney trial referee.
The court concludes that he would not have sold the unit if he knew the defendant would refuse to convey the Breakwater Key unit to him and therefore his loss is directly attributable to its breach of contract. Because no other evidence of value was offered, the court finds the amount of the loss at $22,500.
The total damages then amount to $41,970. The plaintiff is also seeking interest which is to be awarded in the court's discretion. The defendant could have returned the plaintiff's deposit at any time after it CT Page 9438 repudiated the contract on October 28th of 1996. It never did. All Mr. Owens had to do was put the check in the mail to the plaintiff or his attorney. That he never did. Even after the case was settled in court in May of 1997, subject to Mr. Owens paying $19,500 to plaintiff's attorney Kurt Ahlberg by May 16, 1997, he never did so, and has not to this day. That coupled with the fact that Mr. Owens told the plaintiff in September or October of 1996 that he would never get his money back leads the court to conclude that the money was wrongfully withheld and interest should be awarded.
It is, therefore, the judgment of this court that the plaintiff has proven the allegations within count one of his complaint and is awarded damages of $41,970 with interest at the rate of ten percent (10%) per year from the date of the breach of contract October 28, 1996.
GORMLEY, J.